## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **MICHEL JACKSON and MELANIE DOBBS,** | § § § | |
| *Plaintiffs,* | § § | **Civil Action No. 4:17-cv-03885** |
| v. | § § | |
| **HARRIS COUNTY, TEXAS, JUAN A. LERMA, and I. CANTU** | § § § | |
| *Defendants.* | § § | |

---

### DEFENDANT HARRIS COUNTY'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 56

---

Respectfully submitted,


  _/s/ Armando S. Chiu_
Armando S. Chiu
Assistant County Attorney
Federal (Southern District) No. 38696
Texas Bar No. 24006996
HARRIS COUNTY ATTORNEY'S OFFICE
1019 Congress, 15th Floor
Houston, Texas 77002
Telephone: (713) 274-5345
Facsimile: (713) 755-8924
Email: Armando.Chiu@cao.hctx.net

**OF COUNSEL:**
Vince Ryan
Harris County Attorney

**COUNSEL FOR DEFENDANT
HARRIS COUNTY, TEXAS**

# I.

## TABLE OF CONTENTS

II. TABLE OF CITATIONS ....................................................................................................3

III. NATURE AND STAGE OF PROCEEDING ........................................................7

IV. FACTUAL STATEMENT.......................................................................................8

V. STATEMENT OF THE ISSUES ............................................................................17

VI. SUMMARY OF ARGUMENTS ...........................................................................17

VII. SUMMARY JUDGMENT EVIDENCE ..............................................................18

VIII. STANDARD OF REVIEW..................................................................................19

IX. ARGUMENTS AND AUTHORITIES ..................................................................19

    A.  SECTION 1983 GENERALLY ........................................................................19

    B.  HARRIS COUNTY IS ENTITLED TO JUDGMENT ON PLAINITFFS' UNLAWFUL SEIZURE, DETENTION AND/OR ARREST CLAIMS ...................................................23

    C.  HARRIS COUNTY IS ENTITLED TO JUDGMENT ON PLAINTIFFS' EXCESSIVE FORCE CLAIMS...........................................................................................25

    D.  HARRIS COUNTY IS ENTITLED TO JUDGMENT ON PLAINITFF JACKSON'S RACIAL DISCRIMINATION CLAIM..........................................................................27

    E.  PLAINTIFFS' CLAIMS BASED ON RATIFICATION FAIL AS MATTER OF LAW .29

    F.  PLAINTIFFS' *RESPONDEAT SUPERIOR* CLAIM HAS NO BASIS IN LAW..............30

    G.  PLAINITFF JACKSON'S ADA VIOLATION CLAIM ALSO FAIL AS MATTER OF LAW ..................................................................................................................30

CONCLUSION....................................................................................................................37

CERTIFICATE OF SERVICE.............................................................................................38

# II.

## TABLE OF CITATIONS

**Page(s)**

**Cases**

*Albright v. Oliver*,
510 U.S. 266 (1994) ........................................................................ 20

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................................................ 19

*Bennett v. City of Slidell*,
735 F.2d 861 (5th Cir. 1984) ........................................................... 22

*Blessing v. Freestone*,
520 U.S. 329 (1997) ........................................................................ 20

*Board of County Comm'rs of Bryan County v. Brown*,
520 U.S. 397 (1997) ........................................................................ 22

*Carter v. Orleans Parish Public Schools*,
725 F.2d 261 (1984) ........................................................................ 36

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........................................................................ 19

*City of Canton, Ohio v. Harris*,
489 U.S. 378 (1989) ........................................................................ 22

*City of Los Angeles v. Heller*,
475 U.S. 796 (1986) ...........................................................23-24, 26, 28

*Colle v. Brazos Conty, Tex.*,
981 F.2d 237 (5th Cir. 1993) ..................................................... 21, 30

*D.A. v. Houston Indep. Sch. Dist.*,
715 F. Supp. 2d 603 (S.D. Tex. 2009) ............................................. 36

*Davidson v. Cannon*,
474 U.S. 344 (1986) ........................................................................ 20

*Delano-Pyle v. Victoria County*,
302 F.3d 567 (5th Cir. 2002) ........................................................... 36

3

*Domino's Pizza, Inc. v. McDonald,*
546 U.S. 470 (2006) ........................................................................ 27

*Ducket v. City of Cedar Park, Tex.,*
950 F. 2d 272 (5th Cir. 1992) ........................................................ 19

*Dutcher v. Ingalls Shipbuilding,*
53 F.3d 723 (5th Cir. 1995) ........................................................ 32-33

*Farmer v. Brennan,*
511 U.S. 825 (1993) ........................................................................ 20

*Fee v. Herndon,*
900 F.2d 804 (5th Cir.) .................................................................. 20

*Florida v. Jimeno,*
500 U.S. 248 (1991) .................................................................... 23-24

*Fuentes v. Nueces Cty., Tex.,*
689 Fed.Appx. 775 (5th Cir. 2017) .............................................. 29

*Garza v. Harris County, Texas,*
2011 WL 3925020 (S.D. Tex. Sept. 7, 2011) .............................. 21

*Grandstaff v. City of Borger, Tex.,*
767 F.2d 161 (5th Cir. 1985) ........................................................ 29

*Hainze v. Richards,*
207 F.3d 795 (5th Cir. 2000) ...................................................... 31-32

*Hobart v. City of Stafford,*
784 F. Supp. 2d 732 (S.D. Tex. 2011) ...................................... 34-36

*Hogan v. Cunningham,*
722 F.3d 725 (5th Cir. 2013) ........................................................ 25

*Huffman v. County of Los Angeles,*
147 F.3d 1054 (9th Cir. 1998) ...................................................... 22

*James v. Harris County,*
577 F.3d 612 (5th Cir. 2009) ........................................................ 20

*Jett v. Dallas Indep. Sch. Dist.,*
491 U.S. 701 (1989) ........................................................................ 27

*Johnson v. Moore,*
  958 F.2d 92 (5th Cir. 1992) ........................................................................... 22

*Lollar v. Baker,*
  196 F.3d 603 (5th Cir. 1999) ......................................................................... 36

*Lozano v. Ortega,*
  2014 WL 6611595 (W.D. Tex. Nov. 19, 2014) ............................................. 27

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
  475 U.S. 574 (1986) ....................................................................................... 19

*McConney v. City of Houston,*
  863 F.2d 1180 (5th Cir. 1989) ....................................................................... 21

*McCoy v. Texas Dep't of Criminal Justice,*
  2006 WL 2331055 (S.D. Tex. Aug. 9, 2006) ................................................. 34

*Melton v. Dallas Area Rapid Transit,*
  391 F.3d 669 (5th Cir.2004) ........................................................................... 32

*Monell v. New York City Dep't of Soc. Servs.,*
  436 U.S. 658 (1978) ................................................................................ *passim*

*Peterson v. City of Fort Worth, Tex.,*
  588 F.3d 838 (5th Cir. 2009) ............................................................... 21, 29-30

*Pineda v. City of Houston,*
  291 F.3d 325 (5th Cir. 2002) ......................................................................... 21

*Piotrowski v. City of Houston,*
  51 F.3d 512 (5th Cir. 1995) ........................................................................... 22

*Piotrowski v. City of Houston,*
  237 F.3d 567 (5th Cir. 2001) ................................................................... 21, 23

*Rheuark v. Shaw,*
  628 F.2d 297 (5th Cir. 1980) ......................................................................... 22

*Rhode v. Denson,*
  776 F.2d 107 (5th Cir. 1985) ......................................................................... 24

*Rios v. City of Del Rio,*
  444 F.3d 417 (5th Cir. 2006) ......................................................................... 23

*Sanders-Burns v. City of Plano*,
    594 F.3d 366 (5th Cir. 2010) .................................................................... 21

*Schultea v. Wood*,
    47 F.3d 1427 (5th Cir. 1995) .................................................................... 20

*Snyder v. Trepagnier*,
    142 F.3d 791 (5th Cir. 1998) .............................................................. 23, 29

*Spiller v. City of Texas City, Police Dep't*,
    130 F.3d 162 (5th Cir. 1997) ................................................................22-23

*Turner v. Upton County, Tex.*,
    915 F.2d 133 (5th Cir. 1990) .................................................................... 22

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ................................................................................... 27

*Webster v. City of Houston*,
    735 F.2d 83, 739 F.2d 993 (5th Cir. 1984 (en banc)) ............................... 22

*Williams v. Bramer*,
    180 F.3d 699 (5th Cir. 1999) .................................................................... 27

*Worsham v. City of Pasadena*,
    881 F.2d 1336 (5th Cir. 1989) .................................................................. 20

**Statutes**

42 U.S.C. §1983 ....................................................................................*passim*

42 U.S.C. § 12102(1) ................................................................................. 32

42 U.S.C. § 12102(2)(A) ............................................................................ 33

42 U.S.C. § 12132 ...................................................................................... 30

42 U.S.C. § 1981 ........................................................................................ 27

**Rules**

Federal Rules of Civil Procedure 56 ..................................................... 7, 19

**TO THE HONORABLE CHIEF UNITED STATES DISTRICT JUDGE LEE. H. ROSENTHAL:**

Defendant Harris County moves for summary judgment pursuant to Federal Rules of Civil Procedure 56 as set forth below.

## III.

### NATURE AND STAGE OF PROCEEDING

On October 11, 2017, Plaintiffs Michel Jackson and Melanie Dobbs (collectively as "Plaintiffs" and individually as "Plaintiff Jackson" and "Plaintiff Dobbs") initially filed a lawsuit against Harris County, Deputy Juan Lerma and Deputy Ivan Cantu (collectively as "Defendants" and individually as "Harris County", "Deputy Lerma" and "Deputy Cantu") in State District Court alleging a variety of tort claims based on State law and excessive force pursuant to 42 U.S.C. Section 1983. Plaintiffs alleged that on February 7, 2016, they were the victims of the use of excessive force when the Deputies arrested and/or detained Plaintiffs.

As detailed further below under Factual Statement, this case arises from the Deputies contact with Plaintiffs when the Deputies responded to a call from Plaintiffs' neighbor that Plaintiffs' aggressive pitbull had regularly entered the neighbor's backyard by damaging the fence between the houses. While attempting to collect information to create a report, the Deputies encountered individuals who had not only consumed alcoholic beverages but were also belligerent and non-cooperative. The Deputies then witnessed a family violence situation when Plaintiff Jackson yanked Plaintiff Dobbs backed into the house, and then refused to comply with the Deputies' orders as they attempted to detain him.

On January 3, 2018, Harris County removed the lawsuit to Federal Court and filed a motion to dismiss the claims asserted in State Court. Doc. 1. The Deputies filed their motions to dismiss on January 30, 2018. *Doc. 9, 10.*

Plaintiffs then filed their First Amended Complaint on February 8, 2018. *Doc. 14.* In addition to the laundry list of State law claims previously asserted, Plaintiffs alleged that pursuant to 42 U.S.C. Section 1983, Defendants were liable for constitutional violations of unlawful seizure, unlawful arrest/detention, and excessive force. *Doc. 14, counts 3, 4, 5.* Plaintiff Jackson further alleged that he was the victim of racial discrimination in violation of Section 1983 and disability discrimination in violation of the American with Disabilities Act ("ADA"). *Doc. 14, counts 6, 7.*

Defendants timely filed new motions to dismiss. *Doc. 22, 23, 26.*

On May 1, 2018, the Court dismissed all of Plaintiffs' State law claims. *Doc. 37.*

The parties have conducted discovery by exchanging written discovery and taking the deposition of both Plaintiffs as well as Plaintiffs' purported expert, who is currently the subject of a motion to exclude jointly filed by Defendants. *Doc. 78.*

Harris County moves for summary judgment, because Plaintiffs are unable to set forth sufficient evidence to support their claims of constitutional and ADA violations.

This case is set for docket call on February 25, 2020.

## IV.

### FACTUAL STATEMENT

It is undisputed that on February 7, 2016, Deputy Juan Lerma and Deputy Ivan Cantu (collectively as "Deputies") were employed by the Harris County Sheriff's Office ("HCSO"). On that date, the Deputies were on duty, dressed in regulation HCSO uniforms, and driving marked HCSO patrol vehicles. *Exhibit A, ¶ 3; Exhibit B, ¶ 3.* That evening, the Deputies were dispatched to a call from a complainant residing at 17806 Windy Point Drive, Harris County, Texas regarding an aggressive animal. *Id.* The officers received the information that the complainant's neighbor's pitbull had broken the fence and was in the complainant's backyard. *Id.* When the Deputies

arrived, they met with the neighbor Shelli Firmin, who had made the call to the HCSO. *Exhibit A, ¶ 4; Exhibit B, ¶ 3.* Ms. Firmin advised that as she was letting her labrador into the backyard, she noticed that her neighbor's pitbull had broken a picket from the wooden fence and was in her backyard. *Exhibit A, ¶ 4.* The Deputies learned that Ms. Firmin quickly brought her dog inside without incident, as she feared the dogs would get into a fight, and that the pitbull was no longer in the backyard. *Id.* Ms. Firmin's daughter, Lauren Firmin, had managed to corral the dog and brought it out to the front of the residence, where the owners picked it up. *Id.*

The Deputies accompanied Ms. Firmin into the backyard of her residence. *Exhibit A, ¶ 5; Exhibit B, ¶ 3.* She showed them the area of the fence where the pitbull had entered. *Exhibit A, ¶ 5.* Centrally on the north perimeter fence, dividing her backyard and the backyard located at 17810 Windy Point Drive was a lawn chair against a broken piece of fence picket. *Id.* Below the broken picket was a large hole dug into the ground which appeared to have been made by a dog. *Exhibit A, ¶ 5; Exhibit B, ¶ 3.*

Ms. Firmin complained that the neighbor's dog was constantly in her backyard, and that she was worried that it might bite her, her children, or her dogs. *Exhibit A, ¶ 6.* The Deputies learned that Ms. Firmin's landlord had reinforced the fence by changing several pickets and adding additional nails, but that it had not worked to keep the neighbor's dog out of her backyard. *Id.* Deputy Lerma observed that several of the pickets had been replaced, as the older ones were a dark off color. *Id.*

After talking with Ms. Firmin, Deputies Lerma and Cantu made their way to the neighbor's residence located at 17810 Windy Point Drive. *Exhibit A, ¶ 7; Exhibit B, ¶ 4.* The front door of the residence displayed several signs that read: "Beware of dog", "No Trespassin Violators will be shot! Survivors will be shot again!" and "We don't call 911." *Id.* These signs alerted the

Deputies to the possibility that there might be weapons inside the home, as well as the danger of the "funnel" created to the front door by the narrow hallway leading up to it. *Id.*

The Deputies approached the residence with caution. *Exhibit A, ¶ 8; Exhibit B, ¶ 5.* Loud yelling was coming from inside the house. *Exhibit B, ¶ 5.* They rang the doorbell and identified themselves as HCSO deputies. *Exhibit A, ¶ 8; Exhibit B, ¶ 5.* An individual who was later identified as Melanie Dobbs ("Plaintiff Dobbs") answered the door. *Id.* Plaintiff Dobbs greeted the Deputies and they informed her that they had been called out due to her dog being in her neighbor's backyard. *Id.* Plaintiff Dobbs confirmed that her pitbull was in the neighbor's backyard as it had jumped the fence some time earlier in the day. *Exhibit A, ¶ 8.* The Deputies explained that they had been asked by Ms. Firmin to generate a report with regard to the damage which had been done to the fence by the dog. *Exhibit A, ¶ 8; Exhibit B, ¶ 5.* Plaintiff Dobbs smelled like alcohol, but was initially cooperative and agreed to identify herself. *Exhibit A, ¶ 8; Exhibit B, ¶ 5-6.*

While speaking to Plaintiff Dobbs, the Deputies heard a male, later identified as Michel Jackson ("Plaintiff Jackson"), saying along the lines of "That b*tch called y'all" or "That f*cking b*tch called the cops?" *Exhibit A, ¶ 9; Exhibit B, ¶ 5.* Plaintiff Jackson came to the front door with a walker, but he set it aside, and immediately became extremely argumentative towards the Deputies. *Exhibit A, ¶ 9; Exhibit B, ¶ 6.* Plaintiff Jackson yelled at the Deputies, "If that bitch wants to talk she can have her landlord come to us but ya'll need to get off my property." *Exhibit A, ¶ 9.* Plaintiff Jackson remained inside the residence, visibly upset, waving his arms around and constantly interrupting the Deputies as they tried to explain to him why we were talking with Plaintiff Dobbs. *Exhibit A, ¶ 9; Exhibit B, ¶ 6.* On the date of the incident, the Deputies estimated

that Plaintiff Jackson was a large man about 6'4" and 250 pounds. *Id.* Plaintiff Jackson was also slurring his speech. *Exhibit B, ¶ 6.*

The Deputies attempted to explain to Plaintiff Jackson that they needed his information as a report of the incident was being generated due to the fact that property was damaged and that his dog had continuously entered the neighbor's backyard. *Exhibit A, ¶ 10.* Plaintiff Jackson cut the officers off and questioned if anyone had been bitten by the dog. *Id.* Deputy Lerma responded that no one had been bitten, and attempted to explain to him that the officers were trying to prevent that. *Id.* Each time Deputies Lerma and Cantu attempted to reason with Plaintiff Jackson, he would cut them off, arguing in a loud tone of voice as if to tone them out. *Exhibit A, ¶ 10; Exhibit B, ¶ 7.* Plaintiff Dobbs became more agitated as Plaintiff Jackson continued yelling. *Exhibit B, ¶ 7.*

The Deputies repeatedly requested that Plaintiff Jackson provide them with identifying information to be included in the report. *Exhibit A, ¶ 11.* Plaintiff Dobbs walked briefly away from the front door into her residence, and returned with what appeared to be her driver's license. *Exhibit A, ¶ 11; Exhibit B, ¶ 7.* She then walked around Plaintiff Jackson and exited the front door, extending her hand to give the Deputies her driver's license. *Id.* As she did, Plaintiff Jackson yanked Plaintiff Dobbs by her shoulder with his hand, forcing her inside the residence, and stated "F*ck these guys." *Id.*

The Deputies immediately reacted as he now viewed this as a family violence situation. *Exhibit A, ¶ 12; Exhibit B, ¶ 8.* Deputy Lerma stepped partially inside the residence and ordered Plaintiff Jackson to turn around and place his hands behind his back so that he could detain him. *Id.* Simultaneously Deputy Lerma un-holstered his county issued Conducted Electrical Weapon X26, serial X13000Y4R ("Taser"). *Exhibit A, ¶ 12.* Plaintiff Jackson was standing by the bar

counter area trying to retrieve something. *Exhibit B, ¶ 8.* After being ordered several times to place his hands behind his back, Plaintiff Jackson finally did so and revealed a wallet he had pulled from the bar counter, but continued to turn toward his left, not wanting to give his back toward the Deputies, despite their orders. *Exhibit A, ¶ 12; Exhibit B, ¶ 8.* Plaintiff Jackson was ordered to drop the wallet several times, and finally did so. *Exhibit B, ¶ 8.*

As the Deputies continued to order Plaintiff Jackson to comply, at Plaintiff Jackson's behest to go get something, Plaintiff Dobbs ran to the north side of the residence, where she was no longer in view. *Exhibit A, ¶ 13; Exhibit B, ¶ 8.* The Deputies ordered her several times to stop, but she refused to do so. *Exhibit A, ¶ 13.* The Deputies feared that Plaintiff Dobbs was either getting a weapon or releasing her dogs, as they heard several dogs barking from within. *Exhibit A, ¶ 13; Exhibit B, ¶ 8.* Deputy Lerma yelled to Plaintiff Dobbs and made it clear that if her dogs attempted to attack us, he would use the necessary force to prevent any injuries. *Exhibit A, ¶ 13.* The officers were unable to follow Plaintiff Dobbs, because they continued to attempt to detain Plaintiff Jackson. *Exhibit A, ¶ 13; Exhibit B, ¶ 9.* By this time, Plaintiff Jackson had placed both of his hands behind his back. *Id.* Deputy Cantu approached Plaintiff Jackson and with Deputy Lerma's assistance, Deputy Cantu was able to hold onto Plaintiff Jackson's hands behind his back. *Id.* Deputy Cantu grabbed Plaintiff Jackson's fingers, and ordered him to walk backward, and outside the residence, so that the officers could avoid the "fatal funnel" created by the hallway leading up to the front door. *Id.* Deputy Cantu continued to slowly back Plaintiff Jackson out of the doorway to an area by the front door entrance so that he could be safely handcuffed. *Id.* The Deputies ordered Plaintiff Jackson to follow their directions to look away and keep his hands behind his back. *Exhibit A, ¶ 13.* They warned him that we would deploy the Taser if necessary. *Id.* Plaintiff Jackson was walking and moving about without any limitations, but kept looking

back, yelling, and turning towards the Deputies in spite of their repeated orders for him to look away. *Exhibit A, ¶ 13; Exhibit B, ¶ 9.*

Plaintiff Jackson then made another attempt to turn around while yelling at the Deputies. *Exhibit A, ¶ 14.* He pulled away from Deputy Cantu's grip. *Exhibit B, ¶ 9.* Deputy Lerma interpreted his turning to indicate that Plaintiff Jackson was possibly going to assault him. *Exhibit A, ¶ 14.* At this point, Deputy Lerma deployed the Taser in probe mode toward Plaintiff Jackson's back for the standard 5 second cycle. *Exhibit A, ¶ 14; Exhibit B, ¶ 9.* Plaintiff Jackson then fell to the ground. *Id.* No further force was needed to bring Plaintiff Jackson under immediate control. *Exhibit A, ¶ 14.*

After Plaintiff Jackson was tasered, Deputy Lerma ordered Plaintiff Jackson to lay on his stomach with his hands behind his back, which he refused by saying he could not, because he was handicapped. *Exhibit A, ¶ 15.* Prior to this time, Plaintiff Jackson had been standing and walking on his two feet and appeared to have the physical capability to comply with Deputy Lerma's orders. *Exhibit A, ¶ 15; Exhibit B, ¶ 9.* Plaintiff Jackson certainly did not display any physical limitation when he yanked Plaintiff Dobbs back into the house. *Exhibit A, ¶ 15.* Plaintiff Jackson did not express that he needed his walker until *after* he was tasered. *Exhibit B, ¶ 22; Exhibit D2, p. 3, ¶ 4.*

Around the same time the Deputies were attempting to secure Plaintiff Jackson but prior to the tasering, Plaintiff Dobbs had come into view with a camera phone and began recording the incident. *Exhibit A, ¶ 15; Exhibit B, ¶ 9.* Deputy Cantu initially believed that Plaintiff Dobbs was holding a weapon due to the manner she held the cell phone. *Exhibit B, ¶ 9.*

After the tasering, Deputy Cantu was unable to immediately handcuff Plaintiff Jackson, who lay on the ground. *Exhibit A, ¶ 16.* Plaintiff Dobbs approached the officers, initially refusing

their orders to back away. *Exhibit A, ¶ 16.* Plaintiff Dobbs then began moving towards the kitchen area, while continuously yelling. *Exhibit B, ¶ 10.* Deputy Cantu did not know if there were any weapons in the house, and he attempted to prevent the situation from escalating further. *Id.* Deputy Cantu ordered Plaintiff Dobbs to place her hands behind her back so that he could detain her for the remainder of the incident, while the officers waited for back up units to arrive, and secured Plaintiff Jackson. *Exhibit A, ¶ 16; Exhibit B, ¶ 10.* As Deputy Cantu moved to detain Plaintiff Dobbs, she began to pull away from him. *Exhibit B, ¶11.* Due to her pulling away, Deputy Cantu placed Plaintiff Dobbs against a wall to prevent her from pulling away so that he could handcuff her. *Id.* Deputy Cantu used his left hand, open palm and placed it on her upper back to apply the necessary force to keep her from moving or pushing away from the wall. *Id.* Plaintiff Dobbs' upper torso area appeared to make contact with the wall. *Id.* Plaintiff Dobbs continued to be non-compliant by refusing to place her hands behind her back. *Exhibit B, ¶12.* Deputy Cantu then took hold of Plaintiff Dobb's left hand, brought it behind her back, and handcuffed her. *Id.*

Deputy Cantu then assisted Plaintiff Dobbs to sit on the ground. *Id.* Meanwhile, Deputy Lerma kept his focus on Plaintiff Jackson's hands and movements, pursuant to his training. *Exhibit A, ¶ 16.* Deputy Cantu then returned to assist Deputy Lerma, handcuffed Plaintiff Jackson and assisted him in sitting up. *Exhibit A, ¶ 16; Exhibit B, ¶ 12-13.* Plaintiff Jackson remained seated until he was provided with the walker and relocated to a patrol vehicle. *Exhibit A, ¶ 16; Exhibit B, ¶ 13; Exhibit D4, p. 4, ¶ 4-5; Exhibit D10, p. 2, ¶ 1.* EMS was called to check Plaintiffs for any injuries. *Exhibit A, ¶ 16; Exhibit B, ¶ 18; Exhibit D4, p. 3, ¶ 4.*

Once Plaintiff Jackson was handcuffed and had been seated, Deputy Cantu helped her to her feet, walked her to his patrol vehicle, and placed her in the back seat. *Exhibit B, ¶ 14.* After other units arrived, Deputy Cantu then attempted to do a protective sweep of the residence for

other individuals, but was unable to do so, as there were several dogs on the premises. *Exhibit B,* *¶ 15.* Deputy Cantu returned to his marked patrol vehicle and asked Plaintiff Dobbs if she or Plaintiff Jackson had been drinking this evening. *Exhibit B, ¶ 16.* The odor of an alcoholic beverage was more pronounced once Plaintiff Dobbs was in the patrol vehicle. *Id.* Plaintiff Dobbs stated that both she and Plaintiff Jackson had been drinking, and that they had been involved in a verbal altercation earlier in the evening. *Id.* As a result of this altercation, Plaintiff Dobbs had ripped the driver's side door handle off Plaintiff Jackson's truck. *Id.*

Some time after Deputy Lerma deployed the Taser, Plaintiff Jackson accused Deputy Lerma of tasing him because he was a sex offender. *Exhibit A, ¶ 17.* The officers had no knowledge of Plaintiff Jackson's sex offender status until the scene was secured and additional units arrived. *Id.* Deputy Lerma complied at all times with HCSO's policy with regard to the use of the Taser, and reported the deployment of the Taser to his supervisor. *Id.* Meanwhile, HCSO's Sgt. Steve Wilson arrived at the scene along other units. *Id.*

After the scene was under control, Deputy Lerma returned to Ms. Firmin's residence to issue her a citizen's case card. *Exhibit A, ¶ 18.* Deputy Cantu was not with him when he returned to Ms. Firmin's residence. *Id.* While speaking with her, she mentioned that she had seen Plaintiff Jackson on the driveway on different occasions walking around, and that Plaintiff Jackson was probably trying to defraud an insurance claim. *Id.* Ms. Firmin also testified in her deposition of all the instances she witnessed Plaintiff Jackson perform tasks that a "handicapped" person using a walking device should be unable to do. *Exhibit F, p. 40:23-25, 41:1-7, 66:21-25; 67:1-14; 85:3-15, 22-25; 86:1-10.*

At no time during Deputy Lerma's conversations with Ms. Firmin did he use a racial epithet with regard to Plaintiff Jackson or anyone else. *Exhibit A, ¶ 19.* Deputy Lerma did not use the

"N" word about Plaintiff Jackson, nor did he say anything at all about "getting that N." *Id.* Deputy Lerma did not refer to Plaintiff Jackson in a racial manner in any way. *Id.*

Deputy Cantu contacted the Harris County District Attorney's Office, per protocol in Harris County, with regard to possible charges against Plaintiff Jackson and Plaintiff Dobbs. *Exhibit B, ¶ 19.* The District Attorney's Office accepted the charge of interfering with the duties of a public servant on Plaintiff Jackson. *Id.* The District Attorney's Office declined to accept a charge against Plaintiff Dobbs and she was released. *Id.*

By Plaintiff Jackson's own account, he later asked the Deputies "when did y'all decide to tase me?" According to Plaintiff Jackson, one of the Deputies stated "What would you do if you see someone abuse their spouse. Grab her like that and pushed *[sic]* her inside the house." Plaintiff Jackson did not deny or dispute what the Deputy said. Instead, Plaintiff Jackson responded by stating "You put on more bruises on her then I will ever do." *Exhibit D2, p. 3, ¶ 6.*

About five months after the incident, Plaintiffs filed a complaint with HCSO's Internal Affairs Division ("IAD"). *Exhibit D, ¶ 6; Exhibit D1; Exhibit D5; Exhibit D6.* Plaintiffs complained that the Deputies kidnapped, assaulted, and searched their house without probable cause. *Id.* Plaintiffs also provided sworn statements to IAD. The signed complaints and the sworn statements did not accuse the Deputies of racial discrimination. *Id.* IAD thoroughly conducted an investigation into the complaint, and also referred the matter to the District Attorney's Office. *Exhibit D, ¶ 7.* The Administrative Disciplinary Committee reviewed the IAD investigation and did not sustain the charges against Deputies. *Id.* Likewise, the District Attorney's Office independently did not accept the charges. *Id.*

Eight months after the incident, while responding to a disturbance call (at the same location on Windy Point Drive) in which Plaintiff Dobbs alleged that Plaintiff Jackson assaulted her,

Deputy Christopher Cooper observed Plaintiff Jackson "walking on his own accord without the use of any walker, cane, or any other item." *Exhibit D3, p. 1, ¶ 6 – p. 2, ¶1.*

## V.

### STATEMENT OF ISSUES

Harris County respectfully presents the following issues to this Court:

(1)     Should the Court enter summary judgment against the Section 1983 unlawful seizure, arrest and/or detention and excessive force claims in light of the fact that Plaintiffs have no evidence to establish such claims pursuant to the requirements identified in *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978)?

(2)     Should the Court enter summary judgment against the Section 1983 the unlawful racial discrimination claim in light of the fact that Plaintiff Jackson has no evidence to establish such a claim under the *Monell*?

(3)     Should the Court enter summary judgment against Plaintiff Jackson's ADA claim in light of the fact that he cannot make a *prima facie* case of unlawful disability discrimination?

## VI.

### SUMMARY OF ARGUMENTS

Plaintiffs' Section 1983 claims for unlawful seizure, arrest and/or detention and excessive force claim fail as a matter of law, because: (1) Deputies Lerma and Cantu did not violate Plaintiffs' constitutional rights and are entitled to qualified immunity; and, (2) Plaintiffs have no evidence that a Harris County policy, custom or practice known to Harris County's final policymaker was the moving force behind the alleged constitutional violations purportedly committed by Deputies Lerma and Cantu.

Plaintiff Jackson's Section 1983 claim for unlawful race discrimination also fails a matter

of law, because: (1) Deputies Lerma and Cantu did not unlawfully discriminate against Plaintiff Jackson and are entitled to qualified immunity; and, (2) Plaintiffs have no evidence that a Harris County policy, custom or practice known to Harris County's final policymaker was the moving force behind the alleged constitutional violations purportedly committed by Deputies Lerma and Cantu.

Lastly, Plaintiff Jackson's ADA claim fails, because he cannot establish a *prima facie* case of disability discrimination. First, Plaintiff Jackson is not an individual with a qualified disability under the ADA. Second, Plaintiff Jackson was not denied any services or benefits. Third, Plaintiff Jackson cannot show that the denial of any service was due to intentional discrimination against his disability.

## VII.

### SUMMARY JUDGMENT EVIDENCE

Harris County relies on the following summary judgment evidence and incorporates the entirety of the summary judgment evidence herein by reference:

A.     Affidavit of Deputy Juan Lerma
    A1. Photo of the signs posted in front of the house where incident took place
B.     Affidavit of Deputy Ivan Cantu
C.     Affidavit of Sergeant Garrett DeMilia (under seal)
    C1. Use of Force policy (under seal)
    C2. Use of Taser policy (under seal)
    C3. Arrest Procedures (under seal)
    C4. Bias Profiling policy (under seal)
    C5. ADA PowerPoint for training (under seal)
D.     Affidavit of Captain Jennifer Herndon
    D1. IAD complaint filed by Michel Jackson
    D2. Sworn statement of Michel Jackson
    D3. Sworn statement of Deputy Christopher Cooper
    D4. Sworn statement of Sergeant Steve Wilson
    D5. IAD complaint filed by Melanie Dobbs (1)
    D6. IAD complaint filed by Melanie Dobbs (2)

D7.   Sworn statement of Melanie Dobbs (1)
D8.   Sworn statement of Melanie Dobbs (2)
D9.   Harris County District Attorney's Office referral form
D11. Sworn statement of Deputy Ivan Cantu
D12. Cell phone video of incident from Melanie Dobbs (*See* USB flash drive)
E.       Affidavit of Jay Coons, PhD
F.       Deposition testimony of Shelli Firmin (excerpts)
G.       Affidavit of Assistant District Attorney Scott Durfee
G1.  Harris County District Attorney's Office referral form

## VIII.

### STANDARD OF REVIEW

The standard for reviewing a motion for summary judgment is set out in Fed. R. Civ. P. 56, and in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). "The mere existence of some alleged factual disputes between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law. *Id.* at 248. The substantive law identifies which facts are "material". *Id*. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Ducket v. City of Cedar Park, Tex*., 950 F. 2d 272, 276 (5th Cir. 1992). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## IX.

### ARGUMENTS AND AUTHORITIES

A.    **SECTION 1983 GENERALLY.**

Plaintiffs have sued Harris County, Deputy Lerma and Deputy Cantu under 42 U.S.C. Section 1983, the civil rights statute. "Section 1983 'is not itself a source of substantive rights,

but merely provides a method for vindicating federal rights conferred elsewhere. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). To prevail on a Section 1983 claim, Plaintiffs must prove that Defendants, acting under color of law, deprived him of a right secured by the Constitution or laws of the United States. *Blessing v. Freestone*, 520 U.S. 329, 340 (1997). Plaintiffs must support their claim with specific facts demonstrating a constitutional deprivation and may not simply rely on conclusory allegations. *Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir. 1995); *Fee v. Herndon*, 900 F.2d 804, 807 (5th Cir.), *cert. denied*, 498 U.S. 908 (1990). Plaintiffs must also prove that the alleged constitutional or statutory deprivation was intentional or was due to deliberate indifference and was not the result of mere negligence. *Farmer v. Brennan*, 511 U.S. 825, 828-29 (1993); *Davidson v. Cannon*, 474 U.S. 344, 348 (1986).

A governmental entity such as Harris County is liable under Section 1983 only when a deprivation of rights is inflicted pursuant to official policy. *Monell*, 436 U.S. at 690-91; *Worsham v. City of Pasadena*, 881 F.2d 1336, 1339 (5th Cir. 1989). The United States Supreme Court has expressly held that governmental entities may be sued directly under Section 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or discussion officially adopted and promulgated by that body's officers." *Monell,* 436 U.S. at 690. Plaintiffs must plead and prove a custom or policy of Harris County before it can be held liable; a governmental entity cannot be held liable on a *respondeat superior* theory. *Monell*, 436 U.S. at 691; *James v. Harris County*, 577 F.3d 612, 617 (5th Cir. 2009). The Fifth Circuit has summarized the showings required of a plaintiff to hold a governmental entity liable as follows:

> To establish county/municipal liability under Section 1983 … a plaintiff must demonstrate a policy or custom which caused the constitutional deprivation. A municipality may not be held strictly liable for the acts of its non-policymaking employees under a respondeat superior theory. It cannot be held liable solely because it employs a tortfeasor. Rather, only when the execution of a county's policies or its customs deprives an individual of constitutional or federal rights does

liability under Section 1983 result.

*Colle v. Brazos Conty, Tex.,* 981 F.2d 237, 244 (5th Cir. 1993).

The Fifth Circuit has defined official policy or custom as: (1) a policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the governmental entity's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or (2) a persistent, widespread practice of (governmental) officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy.

For a custom or practice to be considered a de facto policy, there must be a pattern of abuse that transcends the error made in a single case. *Piotrowski v. City of Houston*, 237 F.3d 567, 582 (5th Cir. 2001). Customary municipal policy cannot ordinarily be inferred from single constitutional violations. *Id.* at 581. "A pattern requires *similarity and specificity*; *prior* indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question." *Peterson v. City of Fort Worth, Tex.,* 588 F.3d 838, 851 (5th Cir. 2009)(emphasis added). The prior acts must be 'fairly similar to what ultimately transpired and, in the case of excessive use of force, that the prior act must have involved injury to a third party.'" *Sanders-Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010).

A pattern also requires "sufficiently numerous *prior* incidents" as opposed to "isolated" instances or a "handful" of instances. *Id.* at 851 (emphasis added); *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989); *Garza v. Harris County, Texas,* 2011 WL 3925020, at *4 (S.D. Tex. Sept. 7, 2011). In *Pineda*, the Fifth Circuit held that eleven incidents of warrantless entry did not support "a pattern of illegality in one of the Nation's largest cities and police forces." *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002).

Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom the body delegated policy-making authority. The actions of an officer or employee of a municipality do not render the municipality liable under Section 1983 unless they execute official policy as it is defined above. *Webster v. City of Houston*, 735 F.2d 838, 841, *on rehearing on other grounds,* 739 F.2d 993 (5th Cir. 1984 (en banc)); *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992), *quoting Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984). For the purposes of the case before this Court, "it has long been recognized that, in Texas, the county Sheriff is the county's final policymaker in the area of law enforcement, not by virtue of the delegation by the county's governing body but, rather, by virtue of the office to which the sheriff has been elected." *Turner v. Upton County, Tex.*, 915 F.2d 133, 136 (5th Cir. 1990).

Additionally, to prevail, Plaintiffs must establish a direct causal link between Harris County's policy or custom and the alleged constitutional deprivation. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989); *Piotrowski v. City of Houston*, 51 F.3d 512, 517 (5th Cir. 1995). Specifically, Plaintiffs must initially allege that an official policy or custom was a cause in fact of the deprivation of the right included. *Spiller v. City of Texas City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997). Plaintiffs then must establish that a policy or custom was the proximate cause of injuries sustained. *Huffman v. County of Los Angeles*, 147 F.3d 1054, 1059 (9th Cir. 1998); *Rheuark v. Shaw*, 628 F.2d 297, 305 (5th Cir. 1980), *cert. denied. sub. nom., Rheaurk v. Dallas County, Tex.,* 450 U.S. 931 (1981).

Further, to prevail against Harris County under Section 1983, Plaintiffs must demonstrate that Harris County's decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow. *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397 (1997). The United States Supreme Court explained:

It is not enough for a Section 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Brown*, 117 S.Ct. at 1388; *see also Spiller*, 130 F.3d at 167.

Thus, Plaintiffs seeking to recover against Harris County under Section 1983 must first prove a direct causal link between governmental policy and/or custom at issue and the alleged constitutional deprivation; Plaintiffs then must establish that Harris County consciously enacted a policy reflecting 'deliberate indifference' to the constitutional rights of its citizens. *Snyder v. Trepagnier*, 142 F.3d 791, 795-96 (5th Cir. 1998), *cert. dism'd,* 526 U.S. 1083 (1993). Deliberate indifference, the degree of culpability required to hold a governmental entity liable, is a stringent standard of fault, requiring proof that a governmental actor disregarded a known or obvious consequence of his action." *Brown*, 117 S.Ct. at 1391; *Piotrowski* 237 F.3d at 579 (also describing the standard for facially innocuous policies as stringent).

However, in order to even arrive to a *Monell* analysis of Section 1983 claim against Harris County, Plaintiffs must first establish a constitutional violation by Deputies Lerma and/or Cantu. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Rios v. City of Del Rio*, 444 F.3d 417 (5th Cir. 2006). Without a constitutional violation, there is no Section 1983 liability.

**B.    Harris County Is Entitled to Judgment on Plaintiffs' Unlawful Seizure, Detention and/or Arrest Claims.**

Plaintiffs allege that Defendants are liable to them for unconstitutional seizure, detention and/or arrest. *Doc. 14, ¶ 43-52, 63-72.* The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures. However, the "Fourth Amendment does not prohibit all state-initiated searches, it merely proscribes those which are unreasonable." *See, e.g. Florida v.*

*Jimeno*, 500 U.S. 248, 250 (1991). The Supreme Court has held that the "touchstone" of the Fourth Amendment is thus reasonableness. *Id.* at 250.

Harris County adopts by reference and incorporates herein Deputies Lerma and Cantu's arguments, authorities, and summary judgment evidence regarding Plaintiffs' claims for unlawful seizure, detention and/or arrest, as detailed in Deputies' motion for summary judgment. *Doc. 83.* Based on the above, neither Deputy Lerma nor Deputy Cantu violated Plaintiffs' constitutional rights to be free from unlawful seizure, arrest and/or detention. Both Deputies are entitled to qualified immunity. Therefore, Harris County cannot be held liable on Plaintiffs' unlawful seizure, detention and/or arrest claims pursuant to Section 1983. *Heller,* 475 U.S. at 799.

Even if there was a constitutional violation by Deputy Lerma or Deputy Cantu, which Harris County denies, Harris County cannot be held liable on this basis alone. As discussed above, Plaintiffs must first establish that a custom, policy or procedure of a final Harris County policy maker was the moving force of the alleged constitutional violation. *Monell*, 436 U.S. at 690-91. Plaintiffs conclusory allege that Harris County is liable for constitutional violations "as the result of an official policy, custom or pattern … There is a widespread practice of officials or employees of Harris County, including Sheriff's deputies and deputies of eight constables, of unlawful detention and/or arrest in violation of the Fourth Amendment. This practice is so common and well settled as to constitute a custom …" Doc. 14, ¶ 49-50, 69-70.[1]

There is simply no evidence to support these allegations and claims. Plaintiffs have no evidence to show that a custom, policy or procedure, all of which Harris County Sheriff Ron

---

[1] Plaintiffs' inclusion of the Constables' Offices into all their *Monell* allegations concerning pattern and practice is misplaced and irrelevant given the well settled law that a constable is not the final policymaker for a county. *See Rhode v. Denson*, 776 F.2d 107, 109-10 (5th Cir. 1985)(unlike a county judge, a constable's constituency is not county wide). Moreover, this lawsuit revolves around the actions of HCSO's deputies, which operate under HCSO policies as opposed to policies applicable to each constable's precinct.

Hickman[2] had actual or constructive notice, of violating the Fourth Amendment. Instead, Harris County submits as summary judgment evidence the Harris County Sheriff's Office Arrest Procedures. *Exhibit C3.* It is undisputed that these policies concerning detentions and arrests follow standards approved by the Commission on Accreditation for Law Enforcement Agencies, Inc. ("CALEA")[3] and comply with all applicable State and Federal laws. *Exhibit C, ¶ 4.* In fact, the policy itself states that deputies "shall strictly observe the rules of arrest as established in the Texas Code of Criminal Procedure, applicable court decisions, and federal laws. *Exhibit C3, p. 1, section I.* Furthermore, Plaintiffs cannot demonstrate that any of the detention and arrest procedures were the cause in fact or the "moving force" behind the alleged constitutional violation. And even if they could, Plaintiffs cannot establish "deliberate indifference" by Harris County.

There is no genuine issue of material fact with regard to Plaintiffs claims for unlawful seizure, arrest and/or detention. Therefore, Harris County is entitled to judgment as a matter of law.

## C. Harris County Is Entitled to Judgment on Plaintiffs' Excessive Force Claims.

Plaintiffs allege that Defendants are liable to them for using excessive force. *Doc. 14, ¶ 53-62.* To establish a use of force claim against Deputy Lerma and Deputy Cantu, Plaintiffs must prove that they received (1) an injury; (2) that resulted directly and only from the use of force that was excessive to the need; and (3) that the force used was *objectively* unreasonable. *Hogan v. Cunningham*, 722 F.3d 725, 734 (5th Cir. 2013)(emphasis added).

Harris County adopts by reference and incorporates herein Deputies Lerma and Cantu's

---

[2] Ron Hickman was the Harris County Sheriff's Office on or about February 7, 2016.
[3] CALEA was created in 1979 as a credentialing authority through the joint efforts of law enforcement's major executive associations such as the International Association of Chiefs of Police, the National Organization of Black Law Enforcement Executives, the National Sheriff's Association and the Police Executive Research Forum.

arguments, authorities, and summary judgment evidence regarding Plaintiffs' claims for excessive force, as detailed in Deputies' motion for summary judgment. *Doc. 83.* Based on the above, neither Deputy Lerma nor Deputy Cantu violated Plaintiffs' constitutional rights to be free from the use of excessive force. Both Deputies are entitled to qualified immunity. Therefore, Harris County cannot be held liable on Plaintiffs' claim of excessive force pursuant to Section 1983. *Heller,* 475 U.S. at 799.

Even if there was a constitutional violation by Deputy Lerma or Deputy Cantu, which Harris County denies, Harris County cannot be held liable on this basis alone. *Monell*, 436 U.S. at 690-91. Plaintiffs again conclusory allege that Harris County is liable for constitutional violations "as the result of an official policy, custom or pattern … There is a widespread practice of officials or employees of Harris County, including Sheriff's deputies … of unlawful detention and/or arrest in violation of the Fourth Amendment. This practice is so common and well settled as to constitute a custom …" *Doc. 14, ¶ 59-61.*

As before, there is no evidence to support these allegations and claims of excessive force. Plaintiffs have no evidence to show that a custom, policy or procedure, all of which Harris County Sheriff Ron Hickman had actual or constructive notice, of the use of excessive force by the Harris County Sheriff's Office's patrol officers. Instead, Harris County submits as summary judgment evidence the Harris County Sheriff's Office Use of Force Procedures. *Exhibit C1.* These policies follow standards approved by CALEA and which tracks applicable State and Federal laws. *Exhibit C, ¶ 4.* More importantly, the policy specifically defines what is "unreasonable" and prohibits the use of "unreasonable force." *Exhibit C1, p. 4, section V.A.* The policy also describes when use of Tasers are appropriate. *Exhibit C1, p. 18, section c.* Lastly, Plaintiffs cannot demonstrate that the policy regarding use of force was the cause in fact or the "moving force" behind the alleged

constitutional violation. And even if they could, Plaintiffs cannot establish "deliberate indifference" by Harris County.

There is no genuine issue of material fact with regard to Plaintiffs claims for use of excessive force. Therefore, Harris County is entitled to judgment as a matter of law.

## D. HARRIS COUNTY IS ENTITLED TO JUDGMENT ON PLAINTIFF JACKSON'S RACIAL DISCRIMINATION CLAIM

Plaintiff Jackson alleges that was the victim of racial discrimination and appears to make a claim pursuant to the Fourteenth Amendment and 42 U.S.C. § 1981. *Doc. 14, ¶ 74.* Plaintiff acknowledges that the holding in *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 703 (1989) states that Section 1981 does not provide a separate cause of action against local government entities, and that a plaintiff must assert a cause of action against state actors under Section 1983. *Doc. 14, ¶ 78.* However, Plaintiff then alleges that to the extent that this Court permits it, he is seeking recovery for racial discrimination under Section 1981. *Id.* Clearly, under *Jett*, Plaintiff Jackson has no cause of action under Section 1981. However, even if the Court allowed a Section 1981 claim, Plaintiff Jackson cannot support the claim as "any claim brought under § 1981 … must initially identify an impaired 'contractual relationship' ... under which the plaintiff has rights." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476-79 (2006)(Section 1981 provides remedies for racial injustice limited to situations involving contracts); *Lozano v. Ortega*, 2014 WL 6611595, at *7 (W.D. Tex. Nov. 19, 2014)(Section 1981 claim for racial discrimination failed because no interference with contract alleged).

In the context of a Section 1983 claim for equal protection, Plaintiff Jackson must first establish that Deputy Lerma and/or Deputy Cantu "intentionally discriminated against him because of his membership in a protected class." *Williams v. Bramer*, 180 F.3d 699, 705 (5ᵗʰ Cir. 1999); *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)(proof of

racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause).

Harris County adopts by reference and incorporates herein Deputies Lerma and Cantu's arguments, authorities, and summary judgment evidence regarding Plaintiff Jackson's claim of racial discrimination, as detailed in Deputies' motion for summary judgment. *Doc. 83.* Based on the above, neither Deputy Lerma nor Deputy Cantu violated Plaintiffs' constitutional rights to be free from racial discrimination. Both Deputies are entitled to qualified immunity. Therefore, Harris County cannot be held liable on Plaintiff Jackson's claim of racial discrimination pursuant to Section 1983. *Heller,* 475 U.S. at 799.

Even if there was a constitutional violation by Deputy Lerma or Deputy Cantu, which Harris County denies, Harris County cannot be held liable on this basis alone. *Monell*, 436 U.S. at 690-91. Plaintiff Jackson conclusory alleges that Harris County is liable for constitutional violations "as the result of an official policy, custom or pattern … There is a widespread practice of officials or employees of Harris County, including Sheriff's deputies … of unlawful detention and/or arrest in violation of the Fourth Amendment. This practice is so common and well settled as to constitute a custom …" *Doc. 14, ¶ 77-79.*

Once again, there is no evidence to support these allegations and claim of racial discrimination. Plaintiff Jackson has no evidence to show that a custom, policy or procedure, all of which Harris County Sheriff Ron Hickman had actual or constructive notice, of the use of excessive force by the Harris County Sheriff's Office's patrol officers. Instead, Harris County submits as summary judgment evidence the Harris County Sheriff's Office procedures regarding Bias Profiling. *Exhibit C4.* These procedures follow standards approved by CALEA and which tracks applicable State and Federal laws. *Exhibit C, ¶ 4.* HCSO policy specifically prohibits bias

based profiling such as racial profiling. *Exhibit C4, p. 1, section I.* Furthermore, Plaintiffs cannot demonstrate that any of the Bias Profiling procedures were the cause in fact or the moving force behind the alleged constitutional violation. And even if he could, Plaintiff Jackson cannot establish "deliberate indifference" by Harris County.

There is no genuine issue of material fact with regard to Plaintiff Jackson's claims for racial discrimination. Therefore, Harris County is entitled to judgment as a matter of law.

## E.    PLAINTIFFS' CLAIMS BASED ON RATIFICATION FAIL AS A MATTER OF LAW

In each of Plaintiffs' claims of constitutional violations pursuant to Section 1983, Plaintiffs allege that Harris County "ratified" the deputies alleged unlawful actions, because Harris County "chose not to punish the deputies …" *Doc. 14, ¶ 50, 60, 70, 79.* Of course, Plaintiffs must first show that Deputy Lerma or Deputy Cantu violated their constitutional rights. Then, under a ratification theory, Plaintiffs may show an official custom or policy where policymakers ratified the alleged violation of the plaintiff's constitutional rights by failing to discipline those involved. *Fuentes v. Nueces Cty., Tex.*, 689 Fed.Appx. 775, 779 (5th Cir. 2017). However, the Fifth Circuit has specifically limited ratification to cases where the underlying incident is an "extreme factual situation" of the type reflected in *Grandstaff v. City of Borger, Tex.*, 767 F.2d 161 (5th Cir. 1985). In *Grandstaff* officers mistook an innocent bystander for a minor traffic violation suspect and "poured their gunfire at the truck without awaiting any hostile act or sounds, ultimately killing the bystander." *Id* at 168.

Clearly, the case before this Court is not anything that comes close to the "extreme factual situation" reflected in *Grandstaff.* Indeed, the fact pattern in this case is not even close to *Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998) where the Fifth Circuit *declined* to find ratification in an incident where an officer shot a fleeing suspect in the back. Likewise, in *Peterson v. City of*

*Fort Worth, Tex.*, 588 F.3d 838, 844 (5ᵗʰ Cir. 2009), the Fifth Circuit also *declined* to find ratification in an incident where an officer alleged used his knee to strike a suspect on the leg which ruptured the suspects femoral artery and required two surgeries and a two week hospital stay.

Additionally, Plaintiff Jackson's complaint to Internal Affairs Division of the HCSO did *not* allege that he was the victim of racial discrimination. *Exhibit D1; Exhibit D2.* Interestingly, Plaintiff Jackson's allegation of racial discrimination was made for the first time two years *after* the incident when Plaintiffs filed the First Amended Complaint on February 7, 2018. *Doc. 14.*[4]

Consequently, based on the above, Plaintiffs' claims for Section 1983 constitutional violations based on ratification fail as a matter of law, and summary judgment remains proper in Harris County's favor.

### F.  PLAINTIFFS' *RESPONDEAT SUPERIOR* CLAIM HAS NO BASIS IN LAW

Plaintiffs alleges a "catch all" claim by stating that Harris County is vicariously liable for the Deputies' actions under the doctrine of *respondeat superior*. *Doc. 14, ¶ 101.* It is well settled law that a governmental entity cannot be held liable under a *respondeat superior* theory. *Monell*, 436 U.S. at 691; *Colle*, 981 F.2d at 244.

### G.  PLAINTIFF JACKSON'S ADA VIOLATION CLAIM ALSO FAIL AS MATTER OF LAW.

Title II of the ADA provides that: "No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity. *42 U.S.C. Section 12132.* However, the Fifth Circuit held that Title II does not apply to an officer's on-the-street response to reported disturbances *prior* to officer securing the scene and ensuring

---

[4] Plaintiffs originally filed this lawsuit in State court on or about October 11, 2017 in *Jackson v. Harris County*, 2017-67642, 269ᵗʰ Judicial District Court, Harris County. Harris County asks that the Court take judicial notice that Plaintiffs' Original Petition did not make any allegations of racial discrimination.

that there is no threat to human life. *Hainze v. Richards*, 207 F.3d 795, 801 (5ᵗʰ Cir. 2000)(emphasis added). The Fifth Circuit reasoned that "law enforcement personnel conducting in-the-field investigations already face the onerous task of frequently having to instantaneously identify, assess, and react to potentially life-threatening situations. To require the officers to factor in whether their actions are going to comply with the ADA … would pose an unnecessary risk to innocents." *Id.*

Although the incident that made the basis of this lawsuit did not take place on a street, it is nevertheless analogous to the situation contemplated by the Fifth Circuit that officers need to safeguard against threats before complying with the ADA. In fact, the geographical/physical location of the incident made the situation even more perilous for the safety of the officers. More specifically, Deputies Lerma and Cantu were investigating a complaint initiated by Plaintiff Jackson's neighbor Shelli Firmin in regards to Plaintiff's Jackson's pit bull. *Exhibit A, ¶ 3-5; Exhibit B, ¶ 3.* Deputies Lerma and Cantu approached a house with signs that read "We don't call 911" and "Trespassers will be shot, survivors will be shot again", and which contained various depictions of guns and bullets. *Exhibit A, ¶ 7; Exhibit B, ¶ 4.* The Deputies were conscientious and alerted of the possibility of weapons. *Exhibit A, ¶ 7; Exhibit B, ¶ 4.* The Deputies were further conscientious of the "funnel" or "fatal tunnel" created by the narrow hallway leading to the front door, which put them at a severe tactical disadvantage. *Exhibit A, ¶ 7, 13; Exhibit B, ¶ 9; Exhibit D11, ¶ 7.*[5] Deputies Lerma and Cantu were confronted by two individuals that had clearly consumed alcohol and had slurred speech. *Exhibit B, ¶ 5, 16-17, 21; Exhibit D4, p. 3, ¶ 2-3; Exhibit D11, ¶ 6.* Plaintiff Jackson was belligerent, argumentative and refused to cooperate. *Exhibit A, ¶ 9-15; Exhibit B, ¶ 6-9.* Deputies Lerma and Cantu observed Plaintiff Jackson's ability

---

[5] Jay Coons, PhD explains in his expert report that a "fatal funnel" is an enclosed area that provides little cover, which is what Deputies Lerma and Cantu faced in the tight hallway leading to the front door. Exhibit E, ¶ 20.

to walk without the use of walker or any other assisting advice.  *Exhibit A, ¶ 9, 13, 15; Exhibit B, ¶ 6, 7, 8, 9, 22; Exhibit D4, p. 3, ¶ 4.*  When Plaintiff Dobbs attempted to provide her identification to the Deputies as requested, Plaintiff Jackson violently yanked Plaintiff Dobbs back into the house.  *Exhibit A, ¶ 11; Exhibit B, ¶ 7.*  Faced with a potential situation of domestic abuse, Deputies Lerma and Cantu acted accordingly to detain Plaintiff Jackson.  *Exhibit A, ¶ 12; Exhibit B, ¶ 8.*  In order to secure Plaintiff Jackson, it was essential for the Deputies to move out of the "fatal tunnel" created by the hallway leading to the front door.  *Exhibit A, ¶ 13; Exhibit B, ¶ 9; Exhibit E, ¶ 20.*  Plaintiff Dobbs disappeared out of sight when they attempted to detain Plaintiff Jackson, and the Deputies were concerned that Plaintiff Dobbs may have gone to retrieve a firearm and/or let the dogs out.  *Exhibit A, ¶ 13; Exhibit B, ¶ 8.*  Based on the situation described by the evidence described above, the situation faced by the Deputies compels the application of *Hainze.*

However, even if the Court holds that *Hainze* is not applicable, Plaintiff Jackson's ADA claim still fails.  To establish a *prima facie* case under Title II of the ADA, Plaintiff Jackson must show that: (1) that he is a qualified individual with a disability within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability." *Melton v. Dallas Area Rapid Transit,* 391 F.3d 669, 671–72 (5th Cir.2004); *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 725 (5th Cir. 1995).

In order to be considered disabled under the ADA, an individual must have a physical (or mental) impairment that substantially limits one or more of the major life activities, a record of such impairment, or being regarded as having such an impairment.  *42 U.S.C. Section 12102(1).*  A physical impairment, standing alone, is not necessarily a disability as contemplated by the ADA.

*Dutcher*, 53 F.3d at 726. The statute requires an impairment that substantially limits one or more of the major life activities. *Id.* A major life activity includes but are not limited to walking, standing, and speaking. *42 U.S.C. Section 12102(2)(A).*

In our present case, Plaintiff Jackson cannot present any evidence that he is "disabled" within the meaning of the ADA. According to Plaintiff Jackson's pleading, he was handicapped and unable to walk without the use of a "walker." *Doc. 14, ¶ 13, 84.* However, the evidence indicates otherwise. First, prior to the detention, Plaintiff was observed by Deputies Lerma and Cantu to stand and walk without a walker.[6] *Exhibit A, ¶ 9, 13, 15; Exhibit B, ¶ 6, 7, 8, 9, 22.* Second, Deputies Lerma and Cantu witnessed Plaintiff Jackson violently yank Plaintiff Dobbs into the house without the assistance of a walker. *Exhibit A, ¶ 11; Exhibit B, ¶ 7.* Third, Deputies Lerma and Cantu then witnessed Plaintiff Jackson standing and walking backward without the assistance of a walker as they attempted to secure Plaintiff Jackson.[7] *Exhibit A, ¶ 13; Exhibit B, ¶ 9.* Fourth, Plaintiffs' neighbor Shelli Firm testified that she believed Plaintiff Jackson was not "crippled," but was trying to "scam" the insurance company, because for six to nine months prior to the February 7, 2016 incident that makes the basis of this lawsuit, she observed Plaintiff Jackson "acting" crippled and then walking around, doing yard work, doing heavy lifting of paint cans, "huge" doggie bags, lawn equipment. *Exhibit F, p. 40:23-25, 41:1-7, 66:21-25; 67:1-14; 85:3-15, 22-25; 86:1-10.* Ms. Firmin testified that Plaintiff Jackson would "go out in his backyard and starting mowing and weed eating; and then in few minutes, I'd see him leave for work in his wheelchair. And I'd be like, 'huh?'" *Exhibit F, p. 86:7-10.* Fifth, Plaintiff Jackson acknowledged to Sergeant Steve Wilson that he did not need his walker inside the house. *Exhibit D4, p. 3, ¶ 4.*

---

[6] Deputy Lerma stated that he observed Plaintiff Jackson use a walker to come to the front of the house, which was then set aside and not used by Plaintiff Jackson for the duration of the incident.

[7] Deputies Lerma and Cantu's observations about Plaintiff Jackson standing and walking without the necessity of a walker are corroborated by the video that Plaintiff Dobbs took of the incident, which is attached as Exhibit D12.

Lastly, eight months after the incident, while responding to a disturbance call in which Plaintiff Dobbs alleged that Plaintiff Jackson assaulted her, Deputy Christopher Cooper observed Plaintiff Jackson "walking on his own accord without the use of any walker, cane, or any other item." *Exhibit D3, p. 1, ¶ 6 – p. 2, ¶1.* Consequently, Plaintiff Jackson's self-described handicap is not a disability within the meaning of the ADA as his "handicap" did not substantially limit any major life activity.

Furthermore, Plaintiff Jackson cannot show that he was denied the benefits of services by Harris County because of his alleged disability. Indeed, there is no evidence that Plaintiff Jackson was denied any service at all, and Plaintiff cannot show otherwise. Plaintiff Jackson appears to allege that providing him with his walker would have been a "reasonable accommodation" for his alleged disability. *Doc. 14, ¶ 84.* Assuming *arguendo* that Plaintiff Jackson had a disability within the meaning of the ADA, the ADA does not require Harris County and its deputies to "guess" an individual need for accommodation. *Hobart v. City of Stafford*, 784 F. Supp. 2d 732, 758 (S.D. Tex. 2011); *McCoy v. Texas Dep't of Criminal Justice*, 2006 WL 2331055, at *7 (S.D. Tex. Aug. 9, 2006). Instead, a plaintiff must show either he requested an accommodation or that "defendant otherwise had knowledge of an individual's disability and needs, but took no action." *Id.* In our present case, Plaintiff Jackson provided a sworn statement to Internal Affairs Division that "I look back again and was going to tell them I needed my walker. **Before** I was able to tell them that I needed my walker … he tased me and I fell down to the ground." *Exhibit D2, p. 2, ¶ 4.* Consequently, by his own admission, Plaintiff Jackson did *not* make a request for accommodation before he was tased. The cell phone video taken by Plaintiff Dobbs shows Plaintiffs stating a second or two before the Taser was discharged that "he is handicapped," but it was not until *after* the tasing that Plaintiff Jackson stated that he needed a walker. *Exhibit D12, 0:00:10-11, 0:00:23.*

The mere fact that Plaintiff Jackson may use a walker and had a walker inside the house does not impart knowledge to the Deputies of Plaintiff Jackson's self-identified "disability," and that Plaintiff Jackson was *unable* to walk without a walker. Moreover, there is no evidence that the Deputies denied a request for accommodation. In fact, the evidence shows that once Plaintiff Jackson was secured, he remained seated, and he was later given a walker. *Exhibit A, ¶ 16; Exhibit B, ¶ 13; Exhibit D4, p. 3, ¶ 4-5; Exhibit D10, p. 2, ¶ 1.* Assuming *arguendo* that Plaintiff Jackson was denied the accommodation of using a walker the Deputies attempted to secure him, there is no evidence that *not* having a walker caused Plaintiff Jackson "to suffer greater injury or indignity in that process than other arrestees." *Hobart*, 784 F. Supp. at 756. There is no evidence to even suggest that anyone forced Plaintiff Jackson to walk around *without* a walker *after* he said he needed his walker. Indeed, Deputy Terrence Bullard personally assisted Plaintiff Jackson "from the ground to his chair, which assists with mobility …" *Exhibit D10, p. 2, ¶ 1.*

Even if Plaintiff Jackson was able to establish that he was disabled within the meaning of the ADA and that he was denied the benefit of a service, the ADA claim still fails, because Plaintiff Jackson has no evidence to show that the denial benefits or service was caused by his alleged disability. Indeed, as noted above, neither Deputy was even aware that Plaintiff Jackson had a disability within the meaning of the ADA, as Plaintiff Jackson's alleged disability was not open and obvious. Plaintiff Jackson stood, walked, moved, and even yanked Plaintiff Dobbs back into the house without the aid of a walker or any show of a physical limitation. Accordingly, Plaintiff Jackson cannot establish a *prima facie* case under the ADA, and his claim fails as a matter of law.

Plaintiff Jackson also makes two allegations under his ADA claim that are erroneous at best and baseless at worst. First, he alleges that Harris County failed to accommodate his "disability" by properly training its officers. *Doc. 14, ¶ 86.* There is no basis in law or fact that

"training" to officers is an "accommodation" within the meaning of the ADA. Be that as it may be, this allegation is not supported by any evidence because: (1) Plaintiff Jackson did not make a "request" for officers trained to handle persons with disabilities; and, (2) more importantly, the evidence shows that Deputies Lerma and Cantu did receive training regarding the ADA. *Exhibit A, ¶ 2; Exhibit B, ¶ 2; Exhibit C, ¶ 5.* Second, Plaintiff Jackson alleges under his ADA claim that Harris County "adopted and ratified" the deputies' discrimination against Jackson. *Doc. 14, ¶ 86.* This allegation devoid of any legal basis as the individual Deputies cannot even be sued under the ADA because the ADA is meant to prevent discrimination by public agencies, and not officials. *D.A. v. Houston Indep. Sch. Dist.*, 715 F. Supp. 2d 603, 611 (S.D. Tex. 2009)(Ellison, J.)(citing, among others, *Lollar v. Baker*, 196 F.3d 603, 609 (5th Cir. 1999)).

Lastly, it is important to note that Plaintiff Jackson never plead or alleged *intentional* discrimination anywhere in his complaint. Under Fifth Circuit precedent, Plaintiff Jackson may not recover compensatory damages under the ADA. *See Delano-Pyle v. Victoria County*, 302 F.3d 567, 574 (5th Cir. 2002); *Hobart*, 784 F. Supp. 2d at 757. In light of the fact that Plaintiff Jackson made no request for injunctive relief, his ADA claim therefore fails on its face and summary judgment is proper. *See Carter v. Orleans Parish Public Schools*, 725 F.2d 261, 263-64 & n. 7 (1984).

## X.

### CONCLUSION

The Court previously dismissed with prejudice all of the State law based claims. *Doc. 37.* Harris County now respectfully requests that the Court enter a take nothing judgment or dismiss with prejudice all of the remaining claims asserted by Plaintiffs against Harris County in this lawsuit, including but not limited to the claims for unlawful seizure/arrest/detention, excessive

force, racial discrimination, and the ADA.  Harris County further prays for all additional relief that

the Court finds to be in the interest of justice.

Respectfully submitted,

   */s/  Armando S. Chiu*
Armando S. Chiu
Assistant County Attorney
Federal (Southern District) No. 38696
Texas Bar No. 24006996
HARRIS COUNTY ATTORNEY'S OFFICE
1019 Congress, 15th Floor
Houston, Texas 77002
Telephone: (713) 274-5345
Facsimile: (713) 755-8924
Email: Armando.Chiu@cao.hctx.net

**OF COUNSEL:**
Vince Ryan
Harris County Attorney

**COUNSEL FOR DEFENDANT**
**HARRIS COUNTY, TEXAS**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this pleading was delivered on December 16, 2019

to all counsel of record as follows:

**Counsel for Plaintiffs via e-file**
REGINALD E. MCKAMIE, SR.
1900 W. Gray, Unit 131558
Houston, Texas 77219
Telephone: (713) 465-2889
Facsimile: (713) 465-2894
reginaldmckamie@gmail.com
mckamie@mckamie.com

***Counsel for Harris County Sheriff's Deputies Juan Lerma and Ivan Cantu via e-file***
MARY BAKER
Assistant County Attorney
HARRIS COUNTY ATTORNEY'S OFFICE
1019 Congress, 15th Floor
Houston, Texas 77002
Telephone: (713) 274-5265
Facsimile:  (713) 755-8924
Email:  Mary.Baker@cao.hctx.net

*/s/  Armando S. Chiu*
Armando S. Chiu
Assistant County Attorney