**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| MICHEL JACKSON, and<br>MELANIE DOBBS, | §<br>§<br>§ | |
| Plaintiffs, | §<br>§ | |
| VS. | §<br>§ | CIVIL ACTION NO. H-17-3885 |
| HARRIS COUNTY, TEXAS, *et al.*, | §<br>§ | |
| Defendants. | §<br>§ | |

## MEMORANDUM AND OPINION

Michel Jackson and Melanie Dobbs sued Harris County and Harris County Deputy Sheriffs Juan Lerma and Ivan Cantu in Texas state court. The plaintiffs allege that in February 2016, Deputies Lerma and Cantu violated their rights, including their right to be free from excessive force, when the deputies tased Jackson, pushed Dobbs against a wall, and detained them. The court previously granted motions to dismiss certain claims. The County and the individual defendants now separately move for summary judgment on the claims under 42 U.S.C. § 1983 and the Americans with Disability Act, 42 U.S.C. § 12132. (Docket Entry Nos. 80, 83). The defendants also move to exclude the testimony of the plaintiffs' expert witness, Harold Simmons. (Docket Entry No. 78). The plaintiffs responded to both motions, the defendants replied, and the plaintiffs surreplied to the individual defendants' summary judgment motion. (Docket Entry Nos. 86, 87, 90–92).

Based on a careful review of the pleadings, the motions and responses, the record, and the applicable law, the court grants the defendants' motion to exclude Harold Simmons's testimony in part and denies it in part, (Docket Entry No. 78); grants Harris County's summary judgment motion, (Docket Entry No. 80); and grants the individual defendants' summary judgment motion,

(Docket Entry No. 83). Final judgment is entered by separate order. The reasons for these rulings are explained below.

## I.    Background

On February 7, 2016, a woman, Shelli Firmin, called 911 about an aggressive dog that had broken into her yard. (Docket Entry No. 87-2 at 10). Deputy Sheriffs Juan Lerma and Ivan Cantu responded to the call. (Docket Entry No. 80-1 at ¶ 3; Docket Entry No. 80-3 at ¶ 3). The deputies[1] spoke with Firmin, who identified the dog as belonging to her neighbors, the plaintiffs, Michel Jackson and Melanie Dobbs. (Docket Entry No. 80-1 at ¶ 4; Docket Entry No. 80-3 at ¶ 3). Firmin showed the deputies where the dog had broken parts of the fence between her yard and the plaintiffs' yard. (Docket Entry No. 80-1 at ¶ 4–5). Firmin told the deputies that the dog frequently got into her yard and that she was afraid it might bite her, her children, or her dogs. (*Id.* at ¶ 6). Firmin told the deputies that her landlord had reinforced the fence, but the plaintiffs' dog continued to break through. (Docket Entry No. 80-1 at ¶ 6; Docket Entry No. 80-3 at ¶ 3). According to Deputy Cantu, Firmin asked the deputies to file a report about the fence damage and the dog. (Docket Entry No. 80-3 at ¶ 3).

According to their testimony, the deputies went to the plaintiffs' residence to talk with them about Firmin's complaint. (Docket Entry No. 80-1 at ¶ 7; Docket Entry No. 80-3 at ¶ 4). The deputies saw several indications that the plaintiffs might have weapons in their house. (*Id.*). The plaintiffs had signs in the front yard reading "Beware of Dog," "No [sic] Trespassin Violators will be shot! Survivors will be shot again!," and "We don't call 911." (Docket Entry No. 80-1 at ¶ 7; Docket Entry No. 80-3 at ¶ 4).

---

[1] Deputy Lerma and Cantu testified that they both spoke with Firmin before going to the plaintiffs' residence. (Docket Entry No. 80-1 at ¶ 4; Docket Entry No. 80-3 at ¶ 3). Firmin testified that she spoke only to Deputy Cantu. (Docket Entry No. 87-2 at 13-14). The dispute is not material.

The deputies knocked, and Dobbs answered the door. (Docket Entry No. 80-1 at ¶ 8; Docket Entry No. 80-3 at ¶ 5). The deputies explained that they were responding to a complaint about her dog getting into the neighbor's yard. (*Id.*). Dobbs confirmed that her dog had escaped. (*Id.*). According to Deputy Cantu, Dobbs slurred her words and smelled of alcohol. (Docket Entry No. 80-3 at ¶ 5). The parties dispute what happened next.

According to the deputies' accounts, they could hear Jackson yelling from inside the house. (Docket Entry No. 80-1 at ¶ 9; Docket Entry No. 80-3 at ¶ 5). They saw Jackson approach the door using a walker that he set aside near the door. (Docket Entry No. 80-1 at ¶ 9; Docket Entry No. 80-3 at ¶ 6). Jackson was "extremely argumentative," telling the deputies to get off his property. (Docket Entry No. 80-1 at ¶ 9; Docket Entry No. 80-3 at ¶ 6). Deputy Cantu testified that Jackson's speech was also slurred. (Docket Entry No. 80-3 at ¶ 6).

The deputies explained that they needed the plaintiffs' identification to complete their report on Firmin's property damage. (Docket Entry No. 80-1 at ¶ 11; Docket Entry No. 80-3 at ¶ 6). The deputies asked Jackson multiple times for his identification, but he refused. (*Id.*). The deputies testified that Dobbs retrieved her driver's license, but when she walked in front of Jackson to hand it to the deputies, Jackson "yanked Mrs. Dobbs by her shoulder with his hand, forcing her inside the residence and impeding her from stepping out." (Docket Entry No. 80-1 at ¶ 11; Docket Entry No. 80-3 at ¶ 7).

The deputies treated Jackson's actions toward Dobbs as domestic violence and ordered Jackson to turn around and put his hands behind his back. (Docket Entry No. 80-1 at ¶ 12; Docket Entry No. 80-3 at ¶ 8). According to Deputy Cantu, Jackson put his right hand behind his back, but not his left hand. (Docket Entry No. 80-3 at ¶ 8). It appeared to Deputy Cantu that Jackson was reaching for something, which turned out to be a wallet. (*Id.*). The deputies ordered Jackson to drop the wallet and put both hands behind his back. (*Id.*). Deputy Cantu testified that Jackson

3

told Dobbs to get something in the house. (*Id.*). Concerned that Dobbs might be getting a weapon, the deputies ordered her to stay where she was. (*Id.*). Dobbs instead ran into the house, out of the deputies' sight. (Docket Entry No. 80-1 at ¶ 13; Docket Entry No. 80-3 at ¶ 8).

After several more orders to do so, Jackson put both hands behind his back. (Docket Entry No. 80-1 at ¶ 13; Docket Entry No. 80-3 at ¶ 9). The deputies told him to walk backwards so they could handcuff him outside the house. (*Id.*). The deputies testified that Jackson walked with no difficulties or limitations, but that Jackson "continued to turn toward his left, not wanting to give his back" to the deputies. (Docket Entry No. 80-1 at ¶ 12).

Dobbs returned to the front door with a cell phone and yelled at the deputies that she was recording their actions. (Docket Entry No. 80-1 at ¶ 15; Docket Entry No. 80-3 at ¶ 9). The deputies repeated their orders to Jackson to remain facing straight ahead and warned him that if he did not comply, he would be tased. (Docket Entry No. 80-1 at ¶ 13; Docket Entry No. 80-3 at ¶ 9). The deputies contend that Jackson began to turn toward them, while pulling one hand away. (Docket Entry No. 80-1 at ¶ 14; Docket Entry No. 80-3 at ¶ 9). Deputy Lerma tased Jackson, and he fell to the ground. (*Id.*). The deputies handcuffed Jackson and had him sit up. (Docket Entry No. 80-1 at ¶ 16; Docket Entry No. 80-3 at ¶ 13). Jackson accused Deputy Lerma of tasing him because Jackson was a sex offender. (Docket Entry No. 80-1 at ¶ 17).

From inside the house, Dobbs continued yelling. (Docket Entry No. 80-1 at ¶ 16; Docket Entry No. 80-3 at ¶ 10). Deputy Lerma testified that Dobbs approached the deputies as they were handcuffing Jackson. (Docket Entry No. 80-1 at ¶ 16). Deputy Cantu testified that he then saw Dobbs moving back into the house. (Docket Entry No. 80-1 at ¶ 10). Both deputies testified that they were concerned that Dobbs might have access to weapons. (Docket Entry No. 80-1 at ¶ 16; Docket Entry No. 80-3 at ¶ 11). Deputy Cantu ordered her to put her hands behind her back to be handcuffed, but Dobbs pulled away. (Docket Entry No. 80-1 at ¶ 13; Docket Entry No. 80-3 at

¶ 10). Deputy Cantu testified that he moved Dobbs against the counter to handcuff her, and then had Dobbs sit on the ground. (Docket Entry No. 80-1 at ¶ 16; Docket Entry No. 80-3 at ¶ 12).

When another patrol car arrived, Deputy Cantu moved Dobbs to the back of his patrol car. (Docket Entry No. 80-3 at ¶ 14). Dobbs told Deputy Cantu that she and Jackson had been drinking and fighting. (*Id.* at ¶ 16). Deputy Cantu asked Jackson if he and Dobbs had been drinking, which he confirmed. (*Id.* at ¶ 17). Jackson also told Deputy Cantu that Dobbs had taken off a truck-door handle and beat him with it. (*Id.*). During this time, Deputy Lerma returned to Firmin's residence to give her a citizen's case card.[2] (Docket Entry No. 80-1 at ¶ 18). Deputy Cantu called the Harris County District Attorney's Office, which accepted charges against Jackson for interfering with a public servant, but declined to accept any charges against Dobbs. (Docket Entry No. 80-3 at ¶ 19).

In August 2016, Jackson and Dobbs filed complaints against Deputy Cantu and Deputy Lerma. Jackson alleged that they kidnapped, assaulted [Jackson] and [his] fiancée and searched [his] house with no probable cause." (Docket Entry No. 80-5). Dobbs alleged that the deputies "kidnapped, assaulted, [sic] tazed and tried to kill Michel inside [their] home." (Docket Entry No. 80-9). The Harris County District Attorney refused to accept charges against the deputies, concluding that the "[o]pponents fail[ed] to state an actionable criminal complaint. Probable cause exists for arrest." (Docket Entry No. 80-13).

The plaintiffs contest several facts in the deputies' account of the events. (Docket Entry No. 87 at 2–3). First, they assert that Jackson did not grab Dobbs by the shoulder and yank her back into the house. (*Id.* at 2). Second, they assert that neither Jackson nor Dobbs resisted the deputies' orders, making the use of force and the arrests unnecessary. (*Id.* at 3). Jackson explains that he was turning toward the deputies in order to tell them that he was handicapped when he was

---

[2] The parties do not describe what a citizen's case card is.

tased. (Docket Entry No. 87, at 4–5). Third, they assert that when the deputies talked to Firmin before approaching the plaintiffs' home, one of the deputies told Firmin that Jackson was "just a nigger." (*Id.* at 2). Finally, they assert that the deputies were aware of Jackson's criminal history before tasing him. (*Id.*). Both deputies deny that they made a racial slur about Jackson to Firmin or that they knew of his criminal history before the encounter. (Docket Entry No. 80-1 at ¶ 19; Docket Entry No. 80-3 at ¶ 23).

Dobbs's cellphone video is part of the summary judgment record. (Docket Entry No. 80-22). The video begins with the deputies leading Jackson out of the house, with him walking backwards. (*Id.*). Both Dobbs and Jackson can be heard shouting at the deputies. (*Id.*). Dobbs tells them that she has a phone and is recording. (*Id.*). Jackson's words are unintelligible. (*Id.*). Once outside the house, Jackson turns slightly toward the deputies and pulls one arm from behind his back. (*Id.*). The deputies order him to look forward and keep both hands behind his back. (*Id.*). Dobbs shouts that Jackson is handicapped. (*Id.*). Jackson turns toward the deputies, violating the order, and one of the deputies tases him. (*Id.*). Dobbs screams, yelling that Jackson is handicapped. (*Id.*). Jackson is heard yelling that he has a walker. (*Id.*). One of the deputies approaches Dobbs and the video goes dark, but the audio recording continues. (*Id.*). Dobbs can be heard explaining that Jackson needs a walker. (*Id.*). Both plaintiffs can be heard yelling at the deputies for several more minutes. (*Id.*). Dogs can be heard barking in the background. (*Id.*).

The plaintiffs sued Harris County and both deputies in Texas state court, asserting state-law claims for assault and battery, negligence, false imprisonment, trespass, and negligent hiring; federal claims under 42 U.S.C. § 1983 for unlawful seizure, excessive force, unlawful arrest or detention, and racial discrimination; and claims under the Americans with Disabilities Act, 42 U.S.C. § 12132. (Docket Entry No. 1-2). The defendants removed to federal court and moved to dismiss. (Docket Entry Nos. 1, 2). The court dismissed the state-law claims against all defendants,

and dismissed the Americans with Disabilities Act claims against the deputies in their individual capacities. (Docket Entry Nos. 35, 37).[3]

The defendants then separately moved for summary judgment on the remaining claims. (Docket Entry Nos. 80, 83). Together, the defendants also moved to exclude the testimony of the plaintiffs' expert witness, Harold Simmons. (Docket Entry No. 78). The plaintiffs responded to both motions,[4] the defendants replied, and the plaintiffs filed a surreply to the summary judgment motion. (Docket Entry Nos. 86, 87, 90–92). Their arguments and responses are discussed in detail below.

## II.    The Legal Standard for Summary Judgment

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shepherd on Behalf of Estate of Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting FED. R. CIV. P. 56(a)). "A material fact is one that might affect the outcome of the suit under governing law," and "a fact issue is genuine if the evidence is such that a reasonable

---

[3] The individual defendants moved for summary judgment on the Americans with Disabilities Act claim. (Docket Entry No. 83 at 28). The plaintiffs urge the court to "reconsider its previous ruling [dismissing the Americans with Disabilities claim against the deputies in their individual capacity] in light of the fact that there is evidence of Mr. Jackson's disability in that the walker to assist Mr. Jackson while walking was clearly visible . . . and both Mr. Jackson and Ms. Dobbs can be clearly heard informing the officers of Mr. Jackson's disabilities before they tazed [sic] him." (Docket Entry No. 86 at 9). This court dismissed the Americans with Disabilities Act claim brought against the deputies because the Act protects against discrimination by governmental agencies. *See Slocum v. Livingston*, No. H-11-486, 2012 WL 2088953, at *14 n.11 (S.D. Tex. June 8, 2012). Because the plaintiffs also brought a claim under the Americans with Disabilities Act against Harris County, the claim against the individual defendants was properly dismissed.

[4] In their response to the individual defendants' motion for summary judgment, the plaintiffs allege that the individual defendants unlawfully entered their home. (Docket Entry No. 86 at 6). The individual defendants object, arguing that the plaintiffs' first amended complaint did not assert a cause of action for unlawful entry. (Docket Entry No. 90 at 1). The plaintiffs respond that because they alleged facts supporting an illegal entry, the claim "is part and parcel of" their Fourth Amendment claims. (Docket Entry No. 92 at 1). Because the plaintiffs did not identify illegal entry as a cause of action in their first amended complaint. But the court will not consider this a cause of action separate from the unlawful seizure and false arrest claims, but will consider the allegations and evidence of the entry as part of the other claims.

jury could return a verdict for the non-moving party." *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 610 (5th Cir. 2018) (quotations omitted). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and identifying the record evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating'" that "there is an issue of material fact warranting trial.'" *Kim v. Hospira, Inc.*, 709 F. App'x 287, 288 (5th Cir. 2018) (quoting *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)). The moving party must demonstrate the absence of a genuine issue of material fact, but it need not negate the elements of the nonmovant's case. *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017). "If the moving party fails to meet [its] initial burden, [the summary judgment motion] must be denied, regardless of the nonmovant's response." *Pioneer Expl., LLC v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001)).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014). "A party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Lamb v. Ashford Place Apartments L.L.C.*, 914 F.3d 940, 946 (5th Cir. 2019). In deciding a summary judgment motion, "the evidence of the nonmovant is to be believed, and all justifiable inferences

are to be drawn in his or her favor." *Waste Mgmt. of La, L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 972 (5th Cir. 2019) (alterations omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)).

## III. Analysis

### A. Harris County's Motion for Summary Judgment

The County moves for summary judgment on the plaintiffs' § 1983 and Americans with Disabilities Act claims. (Docket Entry No. 80). The County argues that the plaintiffs have failed to raise a triable issue of municipal liability or make a *prima facie* showing of unlawful disability discrimination. (*Id.* at 17–18).

Harris County's summary judgment evidence consists of the following:

- the affidavit of Deputy Juan Lerma, (Docket Entry No. 80-1);
- a photograph of the signs posted in front of the plaintiffs' residence, (Docket Entry No. 80-2);
- the affidavit of Deputy Ivan Cantu, (Docket Entry No. 80-3);
- the affidavit of Harris County Sheriff's Office Sergeant Garrett Demilia, (Docket Entry No. 80-4);
- Harris County Sheriff's Office Use of Force Policy, (Docket Entry No. 80-5);
- Harris County Sheriff's Office Use of Taser Policy, (Docket Entry No. 80-6);
- Harris County Sheriff's Office Arrest Procedures, (Docket Entry No. 80-7);
- Harris County Sheriff's Office Bias Profiling Policy, (Docket Entry No. 80-8);
- Harris County Sheriff's Office Americans with Disabilities Act PowerPoint for training, (Docket Entry No. 80-9);
- the affidavit of Harris County Sheriff's Office Captain Jennifer Herndon, (Docket Entry No. 80-10);
- the Harris County Sheriff's Office Internal Affairs Division Complaint Form filed by Michel Jackson against Deputy Lerma and Deputy Cantu, (Docket Entry No. 80-11);
- Michel Jackson's sworn statement from August 3, 2016, (Docket Entry No. 80-12);
- the sworn statement of Harris County Sheriff's Office Deputy Christopher Cooper, (Docket Entry No. 80-13);
- the sworn statement of Harris County Sheriff's Office Sergeant Steve Wilson, (Docket Entry No. 80-14);
- the Harris County Sheriff's Office Internal Affairs Division Complaint Form filed by Melanie Dobbs against Deputy Lerma and Deputy Cantu (I), (Docket Entry No. 80-15);
- the Harris County Sheriff's Office Internal Affairs Division Complaint Form filed by Melanie Dobbs against Deputy Lerma and Deputy Cantu (II), (Docket Entry No. 80-16);
- Melanie Dobbs's sworn statement from September 7, 2016, (Docket Entry No. 80-17);

- Melanie Dobbs's sworn statement from August 3, 2016, (Docket Entry No. 80-18);
- Harris County District Attorney's Office Civil Rights Division Referral Form, (Docket Entry No. 80-19);
- Harris County Sheriff's Office Deputy Terrence Bullard's sworn statement, (Docket Entry No. 80-20);
- Deputy Ivan Cantu's sworn statement, (Docket Entry No. 80-21);
- Melanie Dobbs's cellphone video from February 7, 2016, (Docket Entry No. 80-22);
- the affidavit of Dr. Jay O. Coons, former commander of the Harris County Sheriff's Office District One, Patrol Bureau, (Docket Entry No. 80-23);
- excerpts from Shelli Firmin's deposition, (Docket Entry No. 80-24);
- the affidavit of Harris County District Attorney's Office Custodian of Records Scott Durfee, (Docket Entry No. 80-25); and
- Harris County District Attorney's Office Civil Rights Division Referral Form, (Docket Entry No. 80-26).

The plaintiffs responded with the following summary judgment evidence:

- Melanie Dobbs's unsworn declaration, (Docket Entry No. 87-1);
- excerpts from Shelli Firmin's deposition, (Docket Entry No. 87-2);
- Michel Jackson's deposition, (Docket Entry No. 87-3); and
- Harold Simmons's deposition, (Docket Entry No. 87-4).

### 1. The § 1983 Claims

Municipalities can be sued directly under 42 U.S.C. § 1983, but cannot be held liable under a theory of vicarious liability or *respondeat superior*. *Webb v. Town of Saint Joseph*, 925 F.3d 209, 214 (5th Cir. 2019) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–91 (1978)). The plaintiffs brought municipal liability claims for unlawful seizure, excessive force, unlawful arrest or detention, and racial discrimination.[5]

To overcome summary judgment on a municipal liability claim, a plaintiff must "demonstrate a dispute of fact as to three elements: that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right."

---

[5] Harris County argues that the plaintiffs' racial discrimination claim also fails because 42 U.S.C. § 1981 does not provide a separate cause of action against local government entities. (Docket Entry No. 80 at 27). "A claim under Section 1983 is the exclusive remedy for a Section 1981 violation by a state actor." *Jones v. Tex. Juvenile Justice Dep't*, 698 F. App'x 215, 216 (5th Cir. 2017). Because the plaintiffs' claims are also brought under § 1983, (*see* Docket Entry No. 14 at 19), the court treats the plaintiffs' racial discrimination claim as one under § 1983.

*Webb*, 925 F.3d at 214 (quoting *Davidson v. City of Stafford*, 848 F.3d 384, 395 (5th Cir. 2017), *as revised* (Mar. 31, 2017)). An official policy may consist of written policy statements, ordinances, or regulations, a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy, or the acquiescence of a person or entity with "final policymaking authority." *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009).

The plaintiffs argue that Harris County is liable for the individual defendants' conduct because the practice of "tasing African American handicapped individuals" is "so common and well settled as to constitute a custom that fairly represents policy." (Docket Entry No. 87 at 10). The plaintiffs designated Harold Simmons as an expert on law enforcement issues, (Docket Entry No. 48), and they rely on his expert report. (Docket Entry No. 87 at 9–10). Simmons refers to two incidents in which African-American women were tased by County deputies—Sheketha Holman, who was tased in November 2016, and Ashley Brown, who was tased in January 2019. (*Id.* at 9–10). Simmons's report does not refer to any other tasing incidents.

Simmons served as a police officer in Kansas City, Kansas for 29 years, retiring in 1997 as a detective and assistant to the police chief. (Docket Entry No. 47 at 5). Harris County and the individual defendants moved to exclude Simmons's testimony as not reliable and containing impermissible legal conclusions. (Docket Entry No. 78 at 3). The plaintiffs respond that Simmons's testimony meets the requirements of Federal Rule of Evidence 702, and that any challenges to Simmons's factual conclusions should be addressed at trial. (Docket Entry No. 85 at 2). The court grants the defendants' motion to the extent it identifies legal conclusions and strikes those conclusions from Simmons's testimony. The defendants' remaining arguments about Simmons's testimony go to the weight of the evidence, not its admissibility.

Three incidents of tasing over four years do not give rise to an inference of a practice or custom that represents municipal policy. "Isolated violations are not the persistent, often repeated, constant violations, that constitute custom and policy as required for municipal section 1983 liability." *Skyy v. City of Arlington*, 712 F. App'x 396, 400 (5th Cir. 2017) (quoting *Piotrowski v. City of Hous.*, 237 F.3d 567, 581 (5th Cir. 2001)). In *Peterson v. City of Fort Worth*, 588 F.3d 838, 851 n.4 (5th Cir. 2009), the court held that "[t]wenty-seven incidents [of excessive force complaints] in four years, with no context as to the overall number of arrests or any comparisons to other cities, is not sufficient evidence of a pattern rising to the level of a policy." The court explained that the plaintiff has the burden of providing the context, such as the size of the police force, to show that the pattern rose to the level of a policy. *Id.*

Here, the record similarly fails to provide any context for the two other incidents the plaintiffs rely on. Both incidents were after the actions at issue and do not support an inference of notice to the County of an unlawful practice over time. "[A] pattern requires 'sufficiently numerous *prior* incidents as opposed to isolated instances.'" *Culbertson v. Lykos*, 790 F.3d 608, 628 (5th Cir. 2015) (quoting *Peterson*, 588 F.3d at 851) (emphasis added).

The plaintiffs also argue that the County is liable under § 1983 because it ratified the deputies' conduct. (Docket Entry No. 87 at 10). The plaintiffs argue that "Harris County officials and policymakers viewed, or had the opportunity to view, the video recording of the incident and chose not to punish the deputies, thereby ratifying and adopting the widespread and unlawful practice, custom, and policy of unlawful seizure that has, and continues to, permeate the Sheriff's department." (*Id.*).

Ratification occurs when "a final policymaker approves a subordinate's recommendation and also the subordinate's reasoning." *Culbertson*, 790 F.3d at 621. The theory is reserved for "extreme factual situations," such as a municipality's failure to act when an officer poured gunfire

onto a truck and killed an innocent occupant. *Peterson*, 588 F.3d at 848 (citing *Grandstaff v. City of Borger*, 747 F.2d 161 (5th Cir. 1985)). The facts here do not present an extreme factual situation. "[A] policymaker who defends conduct that is later shown to be unlawful does not necessarily incur liability on behalf of the municipality." *Id.* (citation omitted). The individual defendants' underlying conduct is not unlawful, but even if it was, it was "not sufficiently extreme to qualify for a finding of ratification." *Davidson*, 848 F.3d at 396. On this record, a ratification theory would be equivalent to a *respondeat superior* theory of liability.

Summary judgment is appropriate as to the municipal liability claims because the plaintiffs have failed to demonstrate a genuine factual dispute material to determining that the alleged unlawful seizures, excessive force, unlawful arrests, or racial discrimination by Harris County sheriff deputies are so common and widespread as to constitute a custom that fairly represents County policy. The court grants the County's motion for summary judgment on the § 1983 claims.

### 2.     The Americans with Disabilities Act Claim

The plaintiffs have alleged that the deputies failed to make reasonable accommodation for Jackson's disability when they tased, handcuffed, and arrested him. (Docket Entry No. 14 at 22). Courts have recognized Americans with Disabilities Act claims when "police properly arrest a suspect but fail to reasonably accommodate his disability during the investigation or arrest, causing him to suffer greater injury or indignity than other arrestees." *Windham v. Harris Cty.*, 875 F. 3d 229, 236 n.7 (5th Cir. 2017) (quoting *In re Hunt v. City of Danville*, 556 F.3d 171, 174 (4th Cir. 2019)).

The County first argues that the Americans with Disabilities Act claim fails as a matter of law because "Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents . . . prior to the officer's securing the scene and ensuring that there is no

13

threat to human life." (Docket Entry No. 80 at 30–31 (quoting *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000)).

In *Hainze v. Richards*, 207 F.3d at 797, an officer shot a man who was under the influence of alcohol and antidepressants, was carrying a knife, and was threatening suicide or "suicide by cop" as he approached the officer. The officers ordered the man to stop, but he refused. *Id.* The court applied the "exigent circumstances" exception to the Americans with Disabilities Act, that the "officers do not first have to consider whether their actions will comply with the ADA in the presence of exigent circumstances and prior to securing the safety of themselves and others or when they are reacting to potentially life-threatening situations." *Wilson v. City of Southlake*, 936 F.3d 326, 331 (5th Cir. 2019) (internal quotation omitted).

The plaintiffs respond that there are genuine factual disputes material to determining whether there was a disturbance or threat to human life that triggered the exception in this case. The evidence, including the video recording of the incident, shows disputed facts as to exigency, but clearly shows that the deputies' treatment of the arrestee was less extreme here than in *Hainze*.

Even with material factual disputes as to exigent circumstances, the plaintiffs have failed to make a *prima facie* showing of disability discrimination. A plaintiff must show: (1) that he is an individual with a qualified disability under the statute; (2) that he is being excluded from participation in, or denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits or discrimination is by reason of his disability. *Wilson*, 936 F.3d at 330 (quoting *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 672–73 (5th Cir. 2004)).

The first element is a plaintiff with "an impairment that substantially limits one or more of the major life activities," including walking. *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir. 1995). "Whether an impairment substantially limits a major life activity is determined in

light of (1) the nature and severity of the impairment, (2) its duration or expected duration, and (3) its permanent or expected permanent or long-term impact." *Id.*

The County argues that the plaintiffs have not made a *prima facie* showing that Jackson had a qualified disability under the Americans with Disabilities Act. (Docket Entry No. 80 at 32–33). The County argues that the summary judgment evidence undermines Jackson's testimony that he cannot walk without a walker, including that on the night of the incident, the deputies saw Jackson walking unassisted. (*Id.* at 33). The plaintiffs respond that the video recording shows that Jackson brought the walker to the door, and cite to Jackson's deposition testimony. (Docket Entry No. 87 at 11). But in that deposition, Jackson testifies that he is not disabled. (Docket Entry No. 87-3 at 41). When asked if he was still disabled, Jackson responded, "No sir, not disabled. I still … feel, feel you know, pain." (*Id.*). Jackson was asked if he requires a walker, and he responded "No, sir, no walker." (*Id.*). The plaintiffs also cite another part of Jackson's deposition testimony referencing his "disability." (*Id.* at 69). Viewing the evidence in the light most favorable to the plaintiffs, there is a genuine factual dispute material to determining whether Jackson had a qualifying disability under the Americans with Disabilities Act.

The second and third elements are whether the plaintiff was excluded from participation in, or denied benefits of, services, programs, or activities for which a public entity is responsible, or is otherwise discriminated against by the public entity because of his disability. The County argues that the plaintiffs cannot show that Jackson was denied the benefits of services because of his disability. (Docket Entry No. 80 at 34). The County frames the issue too narrowly—the plaintiffs may also show that the County discriminated against Jackson by treating him more harshly than others because he was disabled. *See Wilson*, 936 F.3d at 330. "A critical component" of the claim "is proof that the disability and its consequential limitations were known by the entity providing public services." *Windham v. Harris Cty.*, 875 F.3d 229, 236 (5th Cir. 2017) (internal

quotation and alteration omitted). The public entity must also understand "the limitations the plaintiff experienced . . . as a result of that disability." *Id.* (internal quotation and alteration omitted). When a plaintiff fails to directly request a specific accommodation, he can prevail on his reasonable accommodation claim "only by showing that the disability, resulting limitation, and necessary reasonable accommodation were open, obvious, and apparent to the entity's relevant agents." *Id.* at 237 (internal quotation omitted).

The County argues that "[t]he mere fact that Plaintiff Jackson may use a walker and had a walker inside the house does not impart knowledge to the Deputies of Plaintiff Jackson's self-identified 'disability,' and that Plaintiff Jackson was *unable* to walk without a walker." (Docket Entry No. 80 at 35). The plaintiffs respond that the deputies admitted seeing Jackson bring the walker to the door and that the video recording shows that Dobbs told the deputies twice before they tased Jackson that he was handicapped. (Docket Entry No. 87 at 12).

The video recording and the summary judgment evidence reveal that both Jackson and Dobbs were yelling at the deputies, who were trying to restrain Jackson outside his residence. Jackson swore in his criminal complaint against the individual deputies that he did not ask to use his walker until after he was tased. (Document Entry No. 80-6 at 2). The video shows Jackson walking backwards toward the deputies without a walker or apparent difficulty. While Dobbs did yell at the deputies about Jackson having a walker, this is not the direct and specific request for accommodation that the case law requires. The record makes clear that the existence and extent of Jackson's disability are not "open, obvious, and apparent."

Summary judgment is granted for the Americans with Disabilities Act claim.

## C.      The Individual Defendants' Motion for Summary Judgment

Deputies Lerma and Cantu move for summary judgment on the plaintiffs' remaining § 1983 claims for unlawful seizure, excessive force, unlawful arrest or detention, and racial discrimination, asserting qualified immunity. (Docket Entry No. 83).

"Qualified immunity 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Roy v. City of Monroe*, No. 18-31063, 2020 WL 729495, at *6 (5th Cir. Feb. 13, 2020) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). "A good-faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available." *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (internal quotation omitted). The plaintiffs must show that the deputies' actions "violate[d] clearly established . . . constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quotation omitted). The court must engage in a two-pronged inquiry, asking "whether the facts . . . show that the officer's conduct violated a constitutional or statutory right" and "whether the right in question was clearly established at the time of the violation." *Ratliff v. Aransas Cty.*, 948 F.3d 281, 287 (5th Cir. 2020) (quoting *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014)).

"For a right to be clearly established, 'its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). "[The court] must be able to point to controlling authority — or a 'robust consensus of persuasive authority' — that defines the contours of the right in question with a high degree of particularity." *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (en banc) (quoting *Al-Kidd*, 563 U.S. at 742).

The individual deputies' summary judgment evidence consists of:

- the affidavit of Deputy Juan Lerma, (Docket Entry No. 83-1);

- the affidavit of Deputy Ivan Cantu, (Docket Entry No. 83-2);
- Harris County District Attorney's Office Civil Rights Division Referral Form, (Docket Entry No. 83-3);
- the expert opinion report of Jared L. Zwickey, San Joaquin Delta College Associate Professor in the Administration of Justice Discipline, (Docket Entry No. 83-4);
- Michel Jackson's sworn statement from August 3, 2016, (Docket Entry No. 83-5); and
- the expert report of Dr. Jay O. Coons, former commander of the Harris County Sheriff's Office District One, Patrol Bureau, (Docket Entry No. 83-6).

The plaintiffs responded with the following summary judgment evidence:

- Melanie Dobbs's unsworn declaration, (Docket Entry No. 87-1); and
- excerpts from Shelli Firmin's deposition, (Docket Entry No. 87-2).

With their reply brief, the individual defendants submitted the incident report from February 7, 2016. (Docket Entry No. 90-1). The plaintiffs filed a surreply with additional excerpts from Firmin's deposition. (Docket Entry No. 92-1).

### 1.     The Excessive Force Claim

A claim of excessive force requires "(1) [an] injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007). "To determine whether the force was objectively unreasonable, this court must carefully evaluate the individual facts in each case and consider the totality of the circumstances." *Defrates v. Podany*, 789 F. App'x 427, 432 (5th Cir. 2019). The court may consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). A court considers only the information available to the officers at the time. The facts are viewed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Ratliff*, 948 F.3d at 287–88 (quoting *Graham*, 490 U.S. at 396).

Using a taser "when not warranted" can be excessive force. In *Samples v. Vadzemnieks*, 900 F.3d 655, 660 (5th Cir. 2018), two deputies responded to a report that a man needed help. *Id.*

at 657. On the scene, they encountered Samples walking in the road, nearly naked and appearing intoxicated. *Id.* After one deputy tried to restrain Samples, he "growled" and adopted a "fighting stance." *Id.* at 658. The other deputy tased Samples. *Id.* The court found that the officers used excessive force because they "lacked reason to believe that Samples committed a crime, sought to flee, or posed a threat of danger to them." *Id.* at 662.

The individual defendants argue that "Deputy Lerma's use of the Taser against Mr. Jackson based on the totality of the circumstances presented was objectively reasonable." (Docket Entry No. 83 at 19). The plaintiffs respond that "[a]t the time of this incident, both Plaintiffs had a clearly established constitutional right to be free from excessive force." (Docket Entry No. 86 at 4). The parties dispute whether Jackson pulled away or resisted arrest. Resolving disputes in the plaintiffs' favor, there are factual disputes material to determining whether Deputy Lerma was objectively reasonable in tasing Jackson for turning toward him and pulling his arm away.

However, this is not enough to meet the plaintiffs' qualified-immunity burden. In *Hale v. City of Biloxi,* 731 F. App'x 259, 260 (5th Cir. 2018) (per curiam), two police officers shot and then tased Hale during the execution of an arrest warrant for suspected credit card fraud. The officers ordered Hale to put his hands up and repeatedly ordered him to step outside and not put his hands in his pockets. *Id.* at 262. Instead, he lingered inside and repeatedly moved his hands toward his pockets. *Id.* Hale sued the officers in their individual capacities, asserting excessive force in violation of the Fourth Amendment, and the defendants claimed qualified immunity. *Id.* at 261. Hale argued that "no reasonable officer could believe he posed an immediate threat because, unlike in some of our prior cases, Hale was not wanted for a violent offense, resisting or fleeing arrest, or clearly brandishing a weapon." *Id.* at 263. The appellate court disagreed, finding that reasonable officers "could undoubtedly believe Hale was reaching for a weapon and therefore 'posed an immediate threat' to their safety." *Id.* at 262 (internal alteration omitted). The appellate

court explained that even if the officers' actions violated Hale's constitutional rights, Hale failed to show that those rights were clearly established. *Id.* at 264. Hale had attempted to argue that "at the time of the incident, it was clearly established that tasing someone who is not actively resisting arrest and shooting an unarmed, non-threating suspect violates the Fourth Amendment." *Id.* The court explained that "Hale must point to case law clearly establishing that [the defendants] acted unreasonably based on facts similar to the particular circumstances they faced." *Id.* Those facts were "the use of deadly force and a taser where a person suspected of a nonviolent crime ignores repeated warnings to keep his hands visible and step outside of a confined area when he knows the people warning him are armed police officers, even if they have not told him he is under arrest." *Id.* Because Hale did not cite "any such case on point," and did not distinguish prior cases "where officers were entitled to qualified immunity because they reasonably believed the suspect was reaching for a weapon," the appellate court affirmed. *Id.*

The plaintiffs have cited no cases establishing that the individual defendants acted unreasonably based on facts similar to the particular circumstances they faced. The belligerence of both Jackson and Dobbs toward the deputies, their refusals to comply with lawful orders, the signs indicating that weapons could be, and dogs were, present there, are undisputed. The video recording shows that Jackson turned around twice before he was tased, and after a warning. (Docket Entry No. 80-22). Jackson does not dispute that he turned around to speak to the deputies, contrary to their orders. (Docket Entry No. 86 at 4; *see also* Docket Entry No. 80-6 at 2).

The plaintiffs also argue that the deputies used excessive force against Dobbs when she "was doing nothing other than filming the incident and telling the deputies that Jackson was handicapped." (Docket Entry No. 86 at 5). But the plaintiffs' argument challenges the cause for her detention, not the means of the detention. The plaintiffs have not identified evidence that Deputy Cantu used excessive force in detaining Dobbs. The Fifth Circuit instructs that "[e]ven if

she was not under arrest, 'officers may consider a suspect's refusal to comply with instructions . . . in assessing whether physical force is needed to effectuate the suspect's compliance.'" *Westfall v. Luna*, 903 F.3d 534, 548 (5th Cir. 2018) (quoting *Darden v. City of Fort Worth*, 880 F.3d 722, 729 (5th Cir. 2018)). "However, officers must assess not only the need for force, but also the relationship between the need and the amount of force used." *Id.* Dobbs ignored their orders to remain in view and the deputies suspected that she had easy access to weapons. The deputies' actions were not clearly unreasonable in these circumstances.

The deputies are entitled to qualified immunity on the plaintiffs' excessive force claims.

### 2. The Unlawful Seizure, Arrest, or Detention Claims

A Fourth Amendment seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *McLin v. Ard*, 866 F.3d 682, 691 (5th Cir. 2017) (citing *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). The plaintiffs asserted a cause of action for the unlawful seizure of their persons and a cause of action for unlawful arrest and/or detention. (Docket Entry No. 14 at 12, 16). An arrest is a form of seizure for Fourth Amendment purposes. *See McLin*, 866 F.3d at 691. The court analyzes these claims together.

"A warrantless arrest without probable cause violates clearly established law defining an individual's rights under the Fourth Amendment." *Davidson*, 848 F.3d at 391. Probable cause is determined by "the totality of facts and circumstances within a police officer's knowledge *at the moment of the arrest*," and the facts and circumstances must be "sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Flores v. City of Palacios*, 381 F.3d 391, 402 (5th Cir. 2004) (internal quotation omitted). "The facts must be known to the officer at the time of the arrest; post-hoc justifications based on facts later learned cannot support an earlier arrest." *Lincoln v. Turner*, 874 F.3d 833, 842 (5th Cir. 2017) (quoting *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009)). But, ["t]he probable cause can

be for any crime, not just the one the officer subjectively considered at the time." *Davidson*, 848 F.3d at 392. To survive summary judgment, the plaintiffs must show that there was no probable cause and that the "officers were objectively unreasonable in believing there was probable cause for the arrest." *Id.* at 391.

In *Ramirez v. Martinez*, 716 F.3d 369, 372 (5th Cir. 2013), a sheriff's deputy executed a warrant to arrest Ramirez's sister-in-law at Ramirez's business. Ramirez arrived while the officers were present and asked them what was going on. *Id.* Ramirez started yelling at Deputy Martinez, the officer in charge of the operation, and Martinez ordered him to turn around and put his hands behind his back. *Id.* Ramirez refused, and Martinez grabbed his arm while ordering him to comply. Ramirez pulled his arm away, and Martinez tased him in the chest. *Id.* Several officers forced Ramirez to the ground, ordering him to "stop resisting." *Id.* at 373. Martinez tased Ramirez again while he was lying on ground in handcuffs. *Id.* Ramirez alleged that he did not resist after he pulled his arm away, even before he was tased the first time. *Id.* at 372. The court found that Martinez was entitled to qualified immunity on Ramirez's false-arrest claim, because "a reasonable officer at the scene would have thought he had probable cause to arrest Ramirez for resisting arrest." *Id.* at 377. "The great weight of Texas authority indicates that pulling out of an officer's grasp is sufficient to constitute resisting arrest." *Id.* at 376 (collecting authority). Because Ramirez pulled away from Martinez's grasp, Martinez "could have reasonably concluded that Ramirez committed the offense of resisting arrest." *Id.* Because Jackson pulled away from Deputy Cantu's grasp, Deputy Cantu could have reasonably concluded that he had probable cause to arrest Jackson for resisting arrest.

The plaintiffs argue that pulling away from an officer is not enough for resisting arrest under Texas law. (Docket Entry No. 86 at 7–8). But even the cases that the plaintiffs rely on explain that pulling away from an officer's grasp might be "evading arrest," a crime under Texas

law. *See Sheehan v. Texas*, 201 S.W.3d 820, 824 (Tex. App.—Waco 2006) (Gray, C.J. concurring); *Leos v. Texas*, 880 S.W.2d 180, 184 (Tex. App.—Corpus Christi 1994).

The plaintiffs dispute that acts of family violence occurred and argue that the deputies' explanations for arresting Jackson—that he was interfering with public duties under Texas Penal Code § 38.15(a)(1)—were "contrived." (Docket Entry No. 86 at 6–7). But so long as the deputies had probable cause to believe Jackson was committing an offense, Jackson's arrest was not unlawful. *See Davidson*, 848 F.3d at 392.

Dobbs also alleged that she was unlawfully seized, arrested, or detained when Deputy Cantu made physical contact with her, handcuffed her, removed her from her home, and put her in the back of his vehicle. (Docket Entry No. 14 at 12). The individual defendants argue that they are entitled to qualified immunity because Dobbs's detention "was supported by reasonable suspicion." (Docket Entry No. 83 at 27). The deputies point to the signs that indicated weapons were in the residence, Dobbs's aggressive and belligerent demeanor, her refusal to comply with their orders, and their belief that Dobbs was intoxicated. (*Id.* at 27–28).

"[N]ot all detentions are arrests, and not all detentions must be based on probable cause." *Emesowum v. Cruz*, 756 F. App'x 374, 378 (5th Cir. 2018). A stop is may be based on an officer's "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *Id.* (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). A stop "must be carefully tailored to its underlying justification," which may require a fact-specific inquiry. *Id.* at 378–79 (quoting *Fla. v. Royer*, 460 U.S. 491, 498 (1983)). "This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Id.* (quoting *Royer*, 460 U.S. at 500). Handcuffs alone do not turn a stop into an arrest. *United States v. Estrada*, 459 F.3d 627, 634 (5th Cir. 2006).

The individual defendants have identified "articulable facts" supporting their reasonable concern that Dobbs might interfere with Jackson's arrest or harm them. Dobbs's detention was tailored to its purpose of preventing her access to weapons. Dobbs was handcuffed and led to a police car and away from the house. Dobbs has not put forward any evidence or authority for the detention being unlawful in these circumstances, instead relying on a general assertion that a person has a right to be free from unlawful seizure, arrest, and/or detention under the Fourth Amendment. (Docket Entry No. 86 at 6). She has not overcome her summary judgment burden to defeat qualified immunity.

The deputies are entitled to qualified immunity on the plaintiffs' unlawful seizure, arrest, or detention claims.

### 3.    The Racial Discrimination Claim

The Fifth Circuit recognizes that "racial epithets that accompany harassment or a violation of established rights may amount to a separate equal protection violation." *Williams v. Kaufman Cty.*, 352 F.3d 994, 1013 (5th Cir. 2003). "The use of an epithet is . . . strong evidence that a comment or an action is racially motivated," especially when "leveled against a citizen by a police officer." *Williams v. Bramer*, 180 F.3d 699, 706 (5th Cir. 1999); *see also Young v. Green*, No. CIV.A. H-11-1592, 2013 WL 775388, at *14 (S.D. Tex. Feb. 28, 2013). But without "harassment or some other conduct that deprives a victim of established rights," there is no racial discrimination. *Club Retro*, 568 F.3d at 213.

The plaintiffs allege that the deputies committed an equal protection violation because when talking to Firmin before his encounter with the plaintiffs, Deputy Cantu used a racial epithet.[6]

---

[6] Firmin testified that Deputy Cantu was the only deputy who spoke with her and returned to her residence after the plaintiffs were arrested. (*See* Docket Entry No. 87-2 at 33). Deputy Lerma testifies that he tased Jackson and he returned to Firmin's residence to give her a citizen case card. (Docket Entry No. 80-1 at ¶ 18).

(Docket Entry No. 86 at 9). The plaintiffs rely on Firmin's deposition, in which she testified that after Jackson's arrest, Deputy Cantu returned to her house to ask her questions about the plaintiffs. She testified that Deputy Cantu said, "[h]e's just a nigger," in reference to Jackson. (Docket Entry No. 87-2 at 33–34). The plaintiffs argue that Firmin testified that Deputy Cantu made this comment before he arrested Jackson, demonstrating Deputy Cantu's racial animus. (Docket Entry No. 86 at 9; Docket Entry No. 92 at 1–2). The plaintiffs point to a part of the deposition in which it is unclear whether Firmin is referring to her discussion with Deputy Cantu before or after the arrest. (Docket Entry No. 87-2 at 15–16). The deputies argue that the comment did not occur, and that, in any event, Firmin testified that it occurred after the arrest. (Docket Entry No. 90 at 3). In her deposition, Firmin repeats what occurred, testifying that Deputy Cantu "came back, and that's when the comment was made." (Docket Entry No. 87-2 at 33). There is a genuine factual dispute about whether Deputy Cantu made the remark and when. The issue is whether this fact is material to the racial discrimination claim. The defendants argue that even assuming the plaintiffs' version is true, it is insufficient to overcome the qualified immunity defense on summary judgment. (Docket Entry No. 90 at 4).

In *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 213 (5th Cir. 2009), owners and employees of a nightclub raided by law-enforcement agents brought a § 1983 claim for racial discrimination against the agents based on several alleged facts, including that some of the agents used racial epithets during the raid. The appellate court "strongly condemn[ed] the use of racial epithets," but explained that qualified immunity applied because the racial epithets were insufficient to support an inference that "any defendant made a statement that he targeted Club Retro because it was minority-owned and attracted a mixed-race and mixed-ethnicity crowd." The court explained that "the usage alleged here is not probative of . . . discriminatory intent" without "harassment or some other conduct that deprives a victim of established rights." *Id.*

The alleged racial epithet is insufficient to show discriminatory intent. Firmin did not testify that Deputy Cantu claimed to have targeted Jackson because of his race. As in *Club Retro*, there is no additional harassment or other conduct "that deprives a victim of established rights."

The plaintiffs also argue that Dobbs was discriminated against on the basis of her race, because "it can be inferred that the deputies violated Dobbs' rights due to the fact that she was romantically involved with a black man." (Docket Entry No. 86 at 9). The plaintiffs cite no case law or summary judgment evidence that they were treated more harshly because of race. The deputies are entitled to qualified immunity on the plaintiffs' racial discrimination claims.

## IV. Conclusion

The defendants' motion to exclude Harold Simmons's testimony, (Docket Entry No. 78), is granted in part and denied in part. Harris County's motion for summary judgment, (Docket Entry No. 80), is granted. The individual defendants' motion for summary judgment, (Docket Entry No. 83), is granted. Final judgment is separately entered.

SIGNED on February 26, 2020, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge